Docket No. 78197–Agenda 1–November 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DONALD ARMSTRONG, Appellant.

Opinion filed March 19, 1998.

JUSTICE HEIPLE delivered the opinion of the court:

A jury found the defendant, Donald Armstrong, guilty of five counts of first degree murder, and one count each of armed robbery, residential burglary and burglary, in connection with the death of Marion Smigiel. The same jury found the defendant eligible for the death penalty and that no mitigating circumstances existed sufficient to preclude imposition of that sentence. The circuit court entered judgment on the jury's finding and sentenced the defendant to death.
(footnote: 1) The defendant's sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). In this appeal, the defendant raises 25 issues challenging his conviction and death sentence. We affirm in all respects.

I

At the time of her death, 86-year-old Marion Smigiel stood 5 feet 4 inches tall and weighed 123 pounds. She lived in an apartment building which she owned at 4301 West Haddon in Chicago. Stooped over and arthritic, Smigiel walked with a metal cane, but nonetheless managed to collect her tenants' trash, which she would carry to the garage each evening. On the morning of February 4, 1992, police found Smigiel's body lying in a pool of blood on the floor of her garage. Her skull had been smashed into several pieces leaving a gaping hole in her head measuring 5 inches by 2½ inches. Lying next to Smigiel's body was her metal cane–broken in two–along with several bags of trash.

Police found the door to Smigiel's apartment ajar, although there were no signs of forced entry. The bedroom had been ransacked: the mattress was upended, someone had gone through the dresser drawers, and a television set was missing. In the living room, a desk had been rifled through, although a social security check and $1,580 in cash were still in a desk drawer.

After speaking with tenants in the building, police began looking for Richard Makowski, another building tenant. Makowski was known to have had almost daily arguments with the victim and was suspected of stealing money from her in the past. Police found Makowski hiding on a third-floor landing in the building and took him to the police station for questioning. Makowski was released after the initial questioning, but was later arrested and charged with the murder of Marion Smigiel.
(footnote: 2)
The crime went unsolved for several months. No identifiable fingerprints, other than the victim's, were found at the crime scene or at the apartment. Five months after the death of Marion Smigiel, police began looking for the defendant, Donald Armstrong, in connection with an unrelated incident. The defendant reportedly had gotten into some sort of an altercation with his cousin Lamark Odell and Lamark's father, Noba Odell. The Odells told police that they had some information regarding a homicide. The defendant was arrested in connection with the altercation with the Odells.

Lamark Odell told police that six months earlier, the defendant approached him on the street. The defendant asked him for money and explained that he had to leave town because he had killed an old lady in a garage near Division and Kostner after she refused to give him money. The defendant told Odell that he had gained $50 from the incident.

After speaking to the Odells, the police began to investigate the defendant's connection to the murder of Marion Smigiel. The defendant's brother, Ronald Armstrong, told police that he and the defendant knew Richard Makowski, and that the three of them had been drinking one evening in January in Makowski's apartment. Makowski told them how he had stolen money from his landlady, and that she always had money around the third of each month after collecting her tenants' rent. Ronald Armstrong told police that Makowski and the defendant then discussed robbing the old woman and decided to do so on February 3. Ronald Armstrong said that on February 3 the defendant came home with a television set, which he later sold for $50 to his older brother, Anthony Patrick. The defendant told Ronald Armstrong that he took the television set from the home of the woman he had killed. The defendant then, according to Ronald, left town.

The police then spoke with the defendant's brother Anthony Patrick. Patrick explained that he had bought a television set from the defendant for $50 on the night of February 3. The defendant initially told Patrick that he had taken the television from someone who owed him drug money. Later the defendant told Patrick that he had gotten the television set from a woman that he had killed. The defendant told Patrick that he had beaten the woman on the head with a cane because he thought she had some money. She was screaming as he hit her. Patrick told police how he had removed the serial number from the back of the television, and he gave them the television. At the station, the police located the serial number on the inside chassis of the television, which matched the serial number on a television carton found in Marion Smigiel's garage.

The police interviewed the defendant after advising him of his rights. The defendant stated that he understood his rights and agreed to speak to police about Smigiel's death. The police subsequently placed the defendant under arrest for the death of Marion Smigiel. After again being advised of his rights, including the right to remain silent and the right to counsel, the defendant chose to make a court-reported statement. The defendant stated that he and Makowski spoke in early January about robbing Makowski's landlady. Makowski explained that the lady was old and collected rents around the third of every month. At the end of January, the defendant and Makowski spoke again about robbing the defendant. Together, Makowski and the defendant concocted a scheme which called for the defendant to knock on the landlady's door and to pretend to be interested in renting an apartment. The defendant was then to push his way into her apartment and to let Makowski in the back door. The defendant and Makowski agreed to execute their plan on February 3.

The defendant stated that late in the afternoon on February 3, the defendant went to Makowski's building. He noticed Smigiel in the garage putting some garbage away; Makowski was standing on the back porch. The defendant entered the garage, shut the door and told Smigiel that he “was a dope fiend and wanted her money.” Smigiel began to scream. Makowski yelled from the back porch, “Make that bitch be quiet.” The defendant took Smigiel's cane from her and struck her with it. Smigiel continued to scream. Makowski yelled again, “Make that bitch be quiet before someone hear [
sic
] her.” The defendant then hit Smigiel in the head with the cane several more times. The defendant could not recall how many times he struck Smigiel before the cane broke on the last blow and Smigiel fell to the ground.

The defendant then explained that he and Makowski entered Smigiel's apartment and searched for money. Not finding any, the defendant and Makowski took Smigiel's television. The defendant sold the television to one of his brothers for $50 and split the proceeds with Makowski.

After the court reporter transcribed the defendant's statement, he was given the opportunity to read it. He read the first page out loud and made changes to it. The defendant initialed the changes and signed the statement along with a police officer and two assistant State's Attorneys who were present. The defendant was subsequently charged by indictment with five counts of murder and one count each of armed robbery, residential burglary and burglary.

Prior to trial the defendant moved to quash his arrest for lack of probable cause and to suppress certain evidence, including his statement to police. The trial court denied the motions, finding that there was probable cause for the defendant's arrest and that the defendant's court-reported statement was freely and voluntarily given.

A jury subsequently found the defendant guilty on all charges and eligible for the death penalty. At the second stage of the sentencing hearing, the State introduced evidence of the defendant's criminal history, which included prior convictions for battery, aggravated battery, attempted robbery, robbery, armed robbery, and burglary, and an extensive disciplinary record while an inmate with the Illinois Department of Corrections. In mitigation, the defendant elicited testimony of his mother, among others, who stated that she and the defendant's father were alcoholics; that her son was a slow learner; and that she was a single mother who raised her 10 children while on public aid. According to the testimony of a social worker, the defendant's parents had a history of mental illness and alcoholism; the defendant had an extensive history of drug and alcohol abuse; and the defendant grew up in an unstable and sometimes violent home.

The jury unanimously found that there were no mitigating circumstances sufficient to preclude the imposition of the death penalty, whereupon the trial court sentenced the defendant to death. This direct appeal followed.

II

The defendant raises 25 issues on appeal, challenging both his conviction and death sentence. We shall address each in turn.

The defendant first contends that (1) the trial court abused its discretion when it excluded a prospective juror for cause because the venire member indicated she was opposed to capital punishment. While a prospective juror cannot be removed for cause simply because he or she expresses a general objection to the death penalty (
Witherspoon v. Illinois
, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777 (1968)), removal is proper where a juror's views would prevent or substantially impair the performance of his duties as a juror (
People v. Cole
, 172 Ill. 2d 85, 99 (1996)). Whether such is the case is a matter within the trial court's discretion. 
People v. Brown
, 172 Ill. 2d 1, 33 (1996). During 
voir dire
, the juror in question stated that her feelings about the death penalty would in fact affect her ability to find the defendant guilty:

“Court: *** [W]ould you consider the death penalty, you said you would if you thought it was appropriate? Would you sign–

Juror: That's hard for me.

Court: Well–

Juror: Because I'm a mother, I've had kids but to pass down a judgment like that that's like playing God and–

Court: You said you believe in the death penalty, I mean, you have no feelings against the death penalty?

Juror: I'm sorry.

Court: That's all right. If appropriate, if the law and the facts call for it–we'll qualify it. If you found him guilty and if you decided he should receive the death penalty would you sign the verdict form?

Juror: That makes me want to turn and walk away. I'm sorry. I don't know. I don't know how to answer that.

Court: Are you telling me that you couldn't sign a death penalty in any case?

Juror: I don't know. I really don't know. I haven't played God on television. Let somebody else.”

The standard for removal in this instance is whether a prospective juror's views on capital punishment would prevent or substantially impair the performance his or her duties as a juror. 
Cole
, 172 Ill. 2d at 99; 
People v. Williams
, 161 Ill. 2d 1, 54 (1994). It is clear that the juror in question expressed a profound reluctance to vote for a death sentence and she gave tentative, equivocal and even conflicting responses when asked her views on capital punishment. Accordingly, we conclude that the trial court did not abuse its discretion in excusing the juror.

Next the defendant contends that (2) the trial court abused its discretion in denying the defendant's motion for a continuance on the grounds of potentially prejudicial pretrial publicity. Two days before jury selection began, a Chicago newspaper reported that an 11-year-old boy had killed an elderly woman by beating her with a cane and then cutting her throat. In his motion, the defendant asserted that the similar nature of the crime described in the article and the charges against the defendant would encourage the jury to convict him in an attempt to halt a perceived “epidemic” of violence against elderly women. The granting of a continuance is within the trial court's discretion (
People v. Williams
, 173 Ill. 2d 48, 92 (1996)), and not all pretrial publicity necessarily leads to an unfair trial (
Nebraska Press Ass'n v. Stuart
, 427 U.S. 539, 554, 49 L. Ed. 2d 683, 695, 96 S. Ct. 2791, 2800 (1976); 
People v. Taylor
, 101 Ill. 2d 377, 386 (1984)). The issue is whether the jury has the ability to lay aside its impressions and reach a verdict based on the evidence presented at trial. 
People v. Coleman
, 168 Ill. 2d 509, 547 (1995). It strains credulity to assume that the jury here was prejudiced against the defendant by reports of an unrelated crime. Chicago is a big city; its newspapers regularly report on a variety of crimes. Thus, the trial court did not abuse its discretion in denying the defendant's motion.

Now the defendant argues for the first time that the trial court should have inquired during 
voir dire
 whether any of the jurors had read or heard about the similar crime. During 
voir dire
, however, the defendant never requested that the trial court make such an inquiry, nor did he object to the trial court's failure to make such an inquiry. For an issue to be preserved on appeal, a contemporaneous objection must be made at trial and in a subsequent post-trial motion. 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). In failing to do so here, the defendant has waived this issue.

The defendant argues (3) that the trial court abused its discretion when it overruled the defendant's objection to the State's rebuttal closing argument that the defendant treated his victim like a baby seal, because this argument inflamed the passions of the jury. Prosecutors, however, are afforded wide latitude in closing argument, and even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant. 
People v. Kitchen
, 159 Ill. 2d 1, 38 (1994). Nevertheless, prosecutors may not engage in inflammatory arguments designed solely to arouse the passions of the jury. 
People v. Johnson
, 119 Ill. 2d 119, 139 (1987). A trial court's determination regarding the propriety of closing arguments will not be disturbed absent an abuse of discretion. 
People v. Byron
, 164 Ill. 2d 279, 295 (1995). In its closing argument, the defense asserted that the defendant did not have an intent to kill. The State responded in rebuttal:

“Prosecution: He didn't have to kill her. He chose to kill her, though.

When he was striking her with that cane, one can only imagine how loud her screams could have been for anybody to hear her. Because, Folks, I would submit to you that she's on that concrete floor long before that–long before that last blow was struck. He was treating her like she was a baby seal and this guy was competing for poacher of the year.

Defense: Objection, Judge.

Court: Overruled.

Prosecution: Intent to kill? You better believe it. Every time he struck that woman with that cane, his intent was quite clear. At the very least what he knew was, those acts he knew that he was killing her at the very least created a strong probability of death or great bodily harm.

To determine intent you look to his actions. And you'll be able to answer that question.”

Closing arguments must be viewed in their entirety, and remarks must be viewed in context. 
Kitchen
, 159 Ill. 2d at 38. From the context, it is clear that the prosecution's remarks were not improper; rather, they were designed to rebut the defense claim that the defendant lacked an intent to kill. Prosecutors may respond to comments by the defense that clearly invite a response. 
Kitchen
, 159 Ill. 2d at 39. The language and imagery used by the prosecution to describe the defendant's conduct was not a personal attack on the defendant, and was scarcely more prejudicial than a clinical rendition of the cold facts. Therefore, the prosecution's remarks did not deny the defendant a fair trial and the trial court did not abuse its discretion in overruling the defendant's objection.

The defendant complains that (4) the trial court erred in denying the defendant's request that the jury be instructed that the testimony of narcotics addicts should be subject to close scrutiny and that “the law recognizes that narcotics addicts become habitual liars.” The defense cross-examined prosecution witness Ronald Armstrong on his addiction to drugs and alcohol. While parties must be allowed to cross-examine witnesses on the issue of drug use (
People v. Strother
, 53 Ill. 2d 95, 99 (1972)), it is not required that a trial court instruct the jury on the unreliability of testimony by narcotics addicts (
People v. Adams
, 109 Ill. 2d 102, 123 (1985)). It is the function of the jury, not the trial court, to determine the credibility of witnesses. While the defense was free to argue the issue of Ronald Armstrong's credibility in light of his drug addiction, it was not entitled to a jury instruction on the issue.

The defendant contends that (5) the trial court abused its discretion when it allowed morgue and crime scene photographs to go to the jury during its deliberations. Specifically, the defendant argues that whatever probative value the photographs had was outweighed by their potentially prejudicial effect. The responsibility of weighing the probative value and potentially prejudicial effect of photographic evidence rests within the discretion of the trial court. 
People v. Brown
, 172 Ill. 2d 1, 40-41 (1996). Even gruesome or disgusting photographs may be properly admitted into evidence if they are relevant to establish any fact at issue in the case. 
People v. Lucas
, 132 Ill. 2d 399, 439 (1989). Here the photographs showed, among other things, the shattered pieces of the victim's skull. These photographs demonstrated the extent and severity of the injuries suffered by the victim–a valid purpose for admitting such evidence. See 
Brown
, 172 Ill. 2d at 41; 
Kitchen
, 159 Ill. 2d at 35. Furthermore, these photographs countered the defense argument that the defendant did not have an intent to kill by depicting the manner in which Smigiel had been beaten. Accordingly, these photographs were highly probative toward establishing intent, and the trial court did not abuse its discretion in permitting them to go to the jury. 
People v. Williams
, 165 Ill. 2d 51, 64 (1995).

The defendant argues that (6) there was insufficient evidence to convict him of armed robbery because (a) there was no property taken from the person or presence of the deceased and (b) the jury may have relied on this improper conviction in finding him eligible for the death penalty. Armed robbery is the taking of property from the person or presence of another by use of force or by threatening the imminent use of force, while armed with a dangerous weapon. 720 ILCS 5/18–2, 18–1 (West 1996). The property taken does not have to be within the victim's immediate control as long as there is some concurrence between the defendant's threat of force and the taking of the victim's property. 
People v. Blake
, 144 Ill. 2d 314, 320 (1991); 
People v. Lewis
, 165 Ill. 2d 305, 339 (1995). The defendant's argument here is misplaced. The defendant took the victim's cane from her by force and beat her to death with it; then he proceeded to her apartment and took her television set. On these facts, there is a clear concurrence between the defendant's use of force and his taking of Smigiel's television set; and any rational trier-of-fact could have found the essential elements of armed robbery beyond a reasonable doubt. See 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). Accordingly, there was sufficient evidence to convict the defendant of armed robbery and the jury could properly consider this conviction during the death eligibility phase of the trial.

The defendant complains that (7) the trial court abused its discretion in not allowing the defense to argue in the eligibility phase whether the murder occurred in the course of an armed robbery. During the eligibility phase, the defense argued to the jury:

“You also have to consider in considering whether there was a felony murder sequence of events here. All the evidence indicates that first there was this beating and the killing of Marion Smigiel. Then there was the taking of property.”

The trial court subsequently sustained the prosecution's objection to the above-quoted argument and directed the jury to disregard it. Was this an abuse of discretion? No. While an attorney is afforded wide latitude in making arguments, he may not misstate the law. 
People v. Williams
, 161 Ill. 2d 1, 49 (1994); 
People v. Buckley
, 282 Ill. App. 3d 81, 89 (1996). The “sequence of events” here, 
i.e.
, the fact that the armed robbery may not have been completed until after the death of the victim, is of no legal significance. See 
People v. Flores
, 128 Ill. 2d 66, 97 (1989) (holding that it was immaterial that the armed robbery did not commence prior to the fatal gunshots). The defense was permitted and did argue to the jury that the murder did not occur in the course of a felony. The defense argument on the sequence of events, however, constituted a misstatement of law, and thus the trial court did not abuse its discretion in sustaining the prosecution's objection.

The defendant argues that (8) the trial court erred in the eligibility phase when it instructed the jury on the requisite elements of murder during the course of a felony and failed to tender the proper verdict forms. The tendered verdict form was not a special verdict form, but instead was the standard Illinois Pattern Jury Instructions (IPI) general verdict form which is appropriate where only one statutory aggravating factor is at issue. See 
People v. Mack
, 167 Ill. 2d 525, 538 (1995). The verdict form found the defendant “eligible for a death sentence” and that “the statutory aggravating factor exists.” The wrinkle here has to do with the jury instructions. At the eligibility phase of the death penalty hearing, the trial court instructed the jury:

“Before the Defendant may be found eligible for a death sentence under the law, the State must prove the following propositions:

First: That the Defendant was 18 years old or older at the time of the commission of the murder of which he was found guilty at the trial of the case, and

Second: That the following statutory aggravating factors exist:

The murdered person was killed in the course of another felony if the murdered person was actually killed by the Defendant; and the other felony was one or more of the following: armed robbery, residential burglary or burglary.”

The defendant contends that the trial court improperly instructed the jury because it neglected to instruct the jury that the State must prove that the defendant “acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual.” 720 ILCS 5/9–1(b)(6)(b) (West 1996). At sentencing, the State sought to have the defendant declared eligible for the death penalty based on the felony murder provision contained in section 9–1(b)(6) of the Criminal Code of 1961, which provides:

“(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if:

* * *

(6) the murdered individual was killed in the course of another felony if:

(a) the murdered individual:

(i) was actually killed by the defendant, or

(ii) received physical injuries personally inflicted by the defendant ***; and

(b) *** 
the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another
; and

(c) the other felony was one of the following: [armed robbery, robbery, burglary].” (Emphasis added.) 720 ILCS 5/9–1(b)(6) (West 1996).

Illinois Pattern Jury Instructions, Criminal, No. 7B.07(6) (3d ed. 1992), tracks the language of the statute and provides that the culpable mental state must be proven in order to find a defendant eligible for the death penalty.

When compared with the statute and the IPI instruction, it is clear that the complained-of instruction in this case did not contain the requisite language regarding the defendant's culpable mental state. A majority of this court has held that a defendant's death sentence must be vacated where “[a]n essential element which the State was required to prove in order to establish the existence of the sixth aggravating factor–a culpable mental state–was not included in the instruction to the jury.” 
People v. Ramey
, 151 Ill. 2d 498, 545 (1992). In 
Ramey
, however, the defendant had objected to the deficient instruction and preserved the issue on appeal. The defendant in this case failed to do this. A defendant must object to alleged errors at trial and include the objection in a post-trial motion in order preserve the issue for appellate review. 
Enoch
, 122 Ill. 2d at 186.

This waiver doctrine, however, is not absolute; Supreme Court Rule 615(a) provides that plain errors affecting substantial rights may be reviewed on appeal, though not objected to at trial or in a post-trial motion.
(footnote: 3) 134 Ill. 2d R. 615(a). In criminal cases, plain error may be invoked where the evidence is closely balanced or the error was of such magnitude that the accused was deprived of a substantial right and denied a fair trial. 
People v. Bean
, 137 Ill. 2d 65, 80 (1990). Neither element is satisfied here. The evidence of the defendant's guilt is overwhelming, including the defendant's own statement which corroborated the other evidence presented at trial. It is clear from the record that the defendant 
intended
 to kill his victim: he beat her to death with her cane, smashing her skull into three pieces. Moreover, the sentencing jury was 
instructed
 on the issue of the defendant's intent at the guilt phase of the trial. The same jury returned a general verdict finding the defendant guilty of murder. Such a general verdict raises the presumption that the jury found that the defendant committed the most serious crime alleged–intentional murder. 
People v. Thompkins
, 121 Ill. 2d 401, 456 (1988). Accordingly, the trial court's erroneous instructions during the eligibility phase and the tendered general verdict form did not deprive the defendant of a fair trial. Thus, there exists no plain error to excuse the waiver.

The defendant argues next that (9) the trial court abused its discretion in admitting into evidence at the eligibility phase of the death penalty hearing the same crime scene and morgue photographs that the court admitted during the guilt phase of the trial. For the reasons discussed above at (5), the trial court did not abuse its discretion.

The defendant contends that (10) the trial court abused its discretion in sustaining various prosecution objections and restricting Dr. George Savarese, a social worker, from testifying about, among other things, the defendant's genetic predisposition to alcoholism. Although the rules of evidence are relaxed in a sentencing hearing, the evidence offered in the aggravation-mitigation phase of a death penalty hearing must be both relevant and reliable. 
People v. Free
, 94 Ill. 2d 378, 426 (1983); 
People v. Brisbon
, 106 Ill. 2d 342, 364-65 (1985). Relevancy determinations are, of course, within the sound discretion of the trial court. 
Free
, 94 Ill. 2d at 426-27. Here the trial court sustained the prosecution's objections to Savarese's testimony on (a) the history of mental problems in the defendant's family; (b) the existence of a genetic predisposition to alcoholism; (c) whether other members of the defendant's family suffered from mental retardation; (d) the implications of mental retardation; and (e) the defendant's ability to adapt to prison life. On the issue of the history of mental illness, the trial court did allow Savarese to testify “as a licensed social worker and not as a doctor or psychiatrist.” The trial court would not let him testify regarding the mental health of the defendant's brother because his disorder was undiagnosed and the only evidence of any disorder was that the defendant's brother was discharged from the Marines after five weeks. In response to this vague and inconclusive testimony, the trial court stated:

“I strike that as not being any evidence at this point for mental illness of [the defendant's brother]. If you don't know and [the family doesn't] know, I don't know how we could come to that conclusion.”

On the issue of the genetic predisposition to alcoholism, the trial court found that Savarese was not qualified to offer an opinion on genetics. Similarly the trial court ruled that Savarese could not testify whether the defendant suffered from an organic brain disorder, noting that he “is a social worker, not a doctor.” The trial court properly sustained the prosecution's objections to questions involving the history of mental retardation in the defendant's family. Savarese's investigation focused on the defendant–not his family–and speculative testimony regarding the health of the defendant's family would shed little if any light upon the defendant's character and the nature of his crime. Likewise, questions regarding the implications of mental retardation were of dubious relevance. Moreover, the defendant never made a formal offer of proof, which is a prerequisite to appellate review. 
People v. Peeples
, 155 Ill. 2d 422, 457 (1993). Finally, on the question of the defendant's ability to adapt to prison life, Savarese had no particular expertise regarding prison life and had not reviewed in any detail the defendant's extensive 14-year prison record. In sustaining the prosecution's objections in each of these instances, the trial court sought to exclude unreliable or irrelevant evidence or to preclude the witness from offering testimony beyond his expertise. Therefore, the trial court did not abuse its discretion in sustaining prosecution objections to Savarese's testimony.

The defendant argues that (11) the trial court erred in granting the prosecution's motion 
in limine
 to preclude the defense from introducing evidence at the eligibility phase of the sentence and plea agreement of the codefendant, Richard Makowski. The defendant contends that the jury should have able to consider such evidence and whether imposition of the death penalty would have been disproportionally harsh in comparison to Makowski's 60-year prison sentence. The focus of a sentencing hearing, however, is the 
defendant's
 “character and the circumstances of his offense.” 
People v. Jimerson
, 127 Ill. 2d 12, 53 (1989). This court has specifically ruled that introduction of such evidence is neither constitutionally mandated nor relevant to the jury's examination to the individual defendant's character and offense: “requiring the sentencer to examine and compare the relative culpability of the defendants and the circumstances in aggravation and mitigation applicable to each would unnecessarily complicate an already difficult task.” 
People v. Page
, 156 Ill. 2d 258, 272 (1993). Thus, the trial court did not err in granting the prosecution's motion 
in limine
.

The defendant contends that the trial court abused its discretion in excluding testimony from (12) the defendant's sister regarding the death penalty's effect on the defendant's family and (13) the defendant's mother regarding her other children's problems at school and with the law and on “the condition of the furniture” in the family's home. Again, the focus of a sentencing hearing is on the defendant's character and the crime he committed. 
Jimerson
, 127 Ill. 2d at 53. While the rules of evidence are “relaxed” during a sentencing hearing, they are not simply thrown out the window: the evidence offered must still be both relevant and reliable. 
People v. Johnson
, 146 Ill. 2d 109, 152 (1991). The excluded testimony was wholly tangential to the defendant's character and the nature of his offense. Clearly the trial court was within its discretion in excluding such testimony.

The defendant next complains that (14) that the trial court abused its discretion when it sustained the prosecution's objection to defense questions of a psychiatrist regarding the effects of the drug Mellaril on a person suffering from a psychosis. The defense did elicit testimony that during the time the defendant was prescribed Mellaril, the defendant's behavior in prison improved. The trial court, however, sustained the prosecution's objection to questions on the effect Mellaril would have on a psychotic person because the questions assumed a fact not in evidence: there is no evidence that the defendant was a diagnosed psychotic. Subsequently, the defense made no offer of proof: “[w]hen a trial court refuses evidence, no appealable issue remains unless a formal offer of proof is made.” 
Peeples
, 155 Ill. 2d at 457. The purpose of a requiring an offer of proof as a prerequisite to appellate review is to enable the reviewing court to determine whether the exclusion of the evidence was proper. 
People v. Andrews
, 146 Ill. 2d 413, 421 (1992). By neglecting to make a formal offer of proof, the defendant has waived the issue. 
Peeples
, 155 Ill. 2d at 458.

The defendant argues that the trial court abused its discretion in permitting (15) Cameron Forbes, the custodian of records at the Illinois Department of Corrections, to testify regarding the defendant's prison disciplinary record while incarcerated because such records were unreliable, and (16) Sergeant Joseph Knowles, a member of the Inmate Disciplinary Board, to testify as to the defendant's disciplinary record while at the Cook County jail awaiting trial because these records contained unreliable hearsay. With regard to the Forbes' and Knowles' testimony on the defendant's disciplinary records, the defense did not object at trial and did not include the issues in the defendant's post-trial motion. For an issue to be preserved on appeal, an objection must be raised at trial and in a post-trial motion. 
Turner
, 128 Ill. 2d at 555. Thus, these issues are waived. Moreover, there is no plain error. This court has held that the contents of a prison incident report are admissible during the penalty phase of a sentencing hearing:

“ `[O]ur death penalty statute allows the introduction of evidence during the sentencing hearing that would not ordinarily be admissible during the guilt phase of a trial. [Citations.] The factors controlling the admissibility of evidence at a capital sentencing hearing are relevance and reliability, and the determination of admissibility rests in the discretion of the trial court. [Citations.] Hearsay testimony will not 
per se
 be deemed to be inadmissible at a sentencing hearing as denying a defendant's right to confront witnesses. [Citations.]' ” 
People v. Ward
, 154 Ill. 2d 272, 329 (1992), quoting 
People v. Hall
, 114 Ill. 2d 376, 416-17 (1986).

The defendant contends that (17) the trial court abused its discretion in permitting Forbes to testify that he had never seen a disciplinary record worse than the defendant's. The defendant did object to this testimony, but only because the prosecution was putatively using “an incomplete set of reports” to establish the defendant's conduct while incarcerated. In any event, Illinois law permits a lay witness to “express opinion based on his observations where it is difficult or impossible for [the witness] to reproduce for the jury the totality of the conditions perceived and where the opinion given is one that men in general are accustomed to, and capable of, making, comprehending, and understanding.” 
People v. Sprinkle
, 74 Ill. App. 3d 456, 464-65 (1979). Here Forbes testified:

“At the Joliet Correctional Center we take in 450 inmates a week. I have been there for sixteen years and I have never seen anybody with a worse disciplinary record than Donald Armstrong.”

Forbes testified that he is the custodian of such records for the Department of Corrections, and thus he was testifying about matters within his knowledge. His testimony was qualitative in nature and conveyed probative information concerning the defendant's behavior while incarcerated–a relevant issue at the sentencing hearing. Thus, the trial court did not abuse its discretion.

The defendant complains that (18) the trial court abused its discretion and he was denied a fair sentencing hearing because the prosecution's closing argument misrepresented defense counsel's argument, misstated evidence, and improperly impugned the role of defense counsel. “It is axiomatic that parties in closing argument may not go beyond the scope of the evidence presented and facts fairly inferable therefrom [citation], misstate the law [citation], or express their personal opinions on the evidence [citation], or on defendant's guilt [citation].” 
People v. Williams
, 161 Ill. 2d 1, 78 (1994). Arguments designed to play on the jurors' emotions are improper, but all depends on context. 
Williams
, 161 Ill. 2d at 78; 
Kitchen
, 159 Ill. 2d at 38. The complained-of comments here, however, when viewed in their complete context, are not of the kind to so inflame the passions of the jury as to implicate the defendant's right to a fair sentencing hearing. First, in rebuttal to the defense argument regarding the jury's responsibility to follow the law and its role in sentencing, the prosecutor remarked:

“Responsibility. Apparently an absolute and total foreign concept to the Defense. They are the ones who told you Donald Armstrong, he is not responsible for the murder. Wrong.

* * *

They are the ones who told you he was not responsible. He is not eligible for the death penalty. Wrong.

And now they have the audacity to suggest that you are killing a human being. To compare your actions with his actions? Absolutely, totally, 100 percent unequivocally wrong.

Because ladies and gentlemen, the one obligation that you do have that you swore to us that you would uphold is the obligation to follow the law, the one thing that Donald Armstrong had never ever ever done.”

There is nothing improper in these remarks, which were in response to an issue raised by the defense. 
Kitchen
, 159 Ill. 2d at 39.

Next the defendant claims that the prosecution misrepresented the defense argument when it argued to the jury:

“Someone once said all it takes for evil to thrive is for good men to do nothing. That is what they are suggesting you should do–nothing. To give him what he wants.

Don't give him what he wants. Give him what he deserves, what he has earned, what he has spent the better part of an entire lifetime developing and nurturing, the hostility, viciousness and vileness to end human life under no auspices of law.”

The defendant, however, has failed to preserve this issue for appeal because he failed to object to this argument at trial and to raise the issue in his post-trial motion. 
Turner
, 128 Ill. 2d at 555. Moreover, even had the defendant raised the issue, the prosecution's argument was within the proper scope as to what was the appropriate sanction for this particular crime. The defendant also claims that the prosecution mischaracterized facts when it argued that only Dr. Linda Wetzel, a neuropsychologist, testified that the defendant was mentally retarded. The defendant observes that there was evidence from the defendant's mother and teacher that the defendant was a slow learner. The defendant has waived this issue by failing to raise this objection below, and in any event, the record demonstrates that the prosecution's remark was accurate: Wetzel was the only psychologist who classified the defendant as mentally retarded. On this same issue, the defendant complains of a prosecution remark that the defendant did not call Dr. Albert Stipes, a psychiatrist employed by the Psychiatric Institute of the circuit court of Cook County, to testify on the issue of mental retardation because “they probably wouldn't have particularly liked the answer they would have gotten.” The defendant failed to raise this issue in his post-trial motion, and thus has waived it.

The defendant contends that the prosecution improperly argued in its opening statement that the facts surrounding the defendant's crime were “so bad that if Donald Armstrong were to find a cure for cancer on the same day he took a bullet for the President, that still wouldn't be enough” to warrant a sentence less than death. Again, the defendant failed to object during the sentencing hearing to this remark, and thus has waived it.

Finally, the defendant asserts that the prosecution impugned the role of defense counsel when it argued:

“How easy it must be and what a criminal justice system we have when a man can have that type of criminal history, have those acts behind him, have that brutality in his background and have lawyers who stand up here and be able to argue–

* * *

*** –it's not his fault. No, it's society's fault. It is his environment's fault. It is his teacher's fault. And it is going to be your fault. How easy it must be to stand up here do that.

Well, folks, our entire system of a civilized society rests upon the notion of responsibility. And Donald Armstrong must be held to the same standards that each of us are.”

Viewed in context, the prosecution's remarks were not an attack on the defense counsel, but rather an attempt to characterize the manner in which the defendant chose to explain away his criminal history. As with the other allegations of error with regard to the prosecution's argument, we conclude that the trial court did not abuse its discretion in overruling the defendant's objection. Moreover, we are persuaded that the complained-of comments were accurate statements of the evidence and proper responses to the defense case. Finally, in view of the trial court's careful and complete admonitions to the jury to decide the case on the evidence and only the evidence and not on sympathy or prejudice, we conclude that the defendant received a fair sentencing hearing.

The defendant argues that (19) the trial court erred in denying the defendant's motion for discovery of the evidence the prosecution intended to introduce in aggravation at the sentencing hearing. This court, however, has held that discovery of evidence in aggravation is “not constitutionally required.” 
People v. Foster
, 119 Ill. 2d 69, 102 (1987); see also 
People v. Guest
, 166 Ill. 2d 381, 406 (1995); 
People v. Williams
, 147 Ill. 2d 173, 264 (1991). Accordingly, the trial court did not err.

The defendant complains that (20) the admission of hearsay testimony during his sentencing hearing violated his right to confrontation. Hearsay evidence, however, is admissible at sentencing hearings where the evidence is relevant and reliable (
People v. Hall
, 114 Ill. 2d 376, 416-17 (1986)) and does not violate a defendant's right to confront witnesses (
People v. Young
, 128 Ill. 2d 1, 54 (1989)).

The defendant argues that (21) the trial court erred when it refused to instruct the jury with a non-IPI instruction proffered by the defendant which listed several nonstatutory mitigating factors. This court, however, has held that nonstatutory mitigating factors need not be specified in an instruction to the jury when, as here, the jury is instructed that it may consider any relevant mitigation factor not specified in the instruction. 
People v. Jackson
, 145 Ill. 2d 43, 114 (1991).

The defendant contends that (22) the factors in mitigation substantially outweighed the factors in aggravation. Specifically, the defendant cites his “dysfunctional family” and poverty which “deprived him of the opportunity for development of the kind of moral responsibility expected of citizens.” This court has held that the decisions of a capital sentencing jury will not be overturned lightly, particularly where that decision is amply supported by the record. 
People v. Hooper
, 172 Ill. 2d 64, 77 (1996). After reviewing the record in this case, including the brutality of the crime as well as the defendant's extensive and violent criminal history, we conclude that the facts support the sentencing jury's determination.

The defendant raises two challenges to the IPI instructions alleging that (23) the instructions are ambiguous and inadequate to guide the jury in capital cases, and (24) the instructions are unconstitutional because they contain the phrase “no mitigating factors sufficient to preclude the imposition of the death sentence,” which could cause a juror to erroneously believe that he or she must find that more than one mitigating factor exists before voting for a sentence other than death. The defendant, however, never objected to the instructions at trial, offered alternative instructions or included an objection to the instructions in his post-trial motion. Accordingly, the issues are waived. Moreover, this court has already held that the IPI instructions in death penalty cases adequately guide the jury (
People v. Brown
, 172 Ill. 2d 1, 55-56 (1996) (IPI instructions are constitutionally sound); 
People v. Franklin
, 167 Ill. 2d 1, 29 (1995) (same)) and that the instructions apprise the jurors that the existence of any one mitigating factor is sufficient to preclude a death sentence (
cf. People v. Smith
, 176 Ill. 2d 217, 260 (1997)).

Finally, the defendant argues that (25) the Illinois death penalty statute is unconstitutional on 12 grounds. This court has already decided each of the issues raised by the defendant. See, 
e.g.
, 
People v. Gaines
, 88 Ill. 2d 342, 369 (1981) (pretrial notice of intent to seek death penalty is not constitutionally mandated); 
People v. Orange
, 121 Ill. 2d 364, 390 (1988) (the statutory grant of prosecutorial discretion in deciding whether to seek the death penalty is not unconstitutional and the statute does not place an improper burden on the defendant to establish that a noncapital sentence should be imposed); 
People v. Albanese
, 104 Ill. 2d 504, 541-42 (1984) (statute provides sufficient information-gathering procedures to insure adequate appellate review); 
People v. Perez
, 108 Ill. 2d 70, 97 (1985) (statute is not unconstitutional because it does not provide a means to assure that all aggravating factors are relevant and permissible; the reviewing court may examine the evidence for relevancy); 
People v. Lewis
, 88 Ill. 2d 129, 144-46 (1981) (statutory aggravating factor “no significant history of prior criminal history” is neither vague nor overly broad); 
People v. Spreitzer
, 123 Ill. 2d 1, 43 (1988) (instructions do not preclude the jurors from making a “reasoned moral response” to the defendant's background, character and crime (emphasis omitted)); 
People v. St. Pierre
, 146 Ill. 2d 494, 520 (1992) (statute sufficiently minimizes the risk against the arbitrary and capricious imposition of the death penalty); 
People v. Gilliam
, 172 Ill. 2d 484, 522 (1996) (statute is not invalid because it allows the sentencer to consider nonstatutory aggravating factors); 
People v. Stewart
, 123 Ill. 2d 368, 377-82 (1988) (fact that prosecutorial discretion may be exercised unevenly by different prosecutors does not render the statute unconstitutional); 
People v. Page
, 155 Ill. 2d 232, 282-83 (1993) (it is not unconstitutional to allow the prosecution both initial and rebuttal arguments in the capital sentencing hearing). We decline to overrule our prior decisions and continue to adhere to our holdings on these issues.

III

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 12, 1998, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

Affirmed.

CHIEF JUSTICE FREEMAN, concurring in part and dissenting in part:

I, like my colleagues, believe that defendant's convictions must be affirmed; however, I am unable to conclude, as they do, that defendant's death sentence must also be affirmed. I specifically take issue with the majority's decision to hold, as waived, defendant's arguments concerning the errors associated with the death eligibility verdict form and jury instructions. In my opinion, our precedents compel a different resolution to this issue from the one the court reaches today. Accordingly, I respectfully dissent from that portion of the opinion.

I

The dispositive question raised with respect to this issue is whether defendant's failure to object to these errors at trial and his failure to include the issue in his post-trial motion bars review of the matter in this direct appeal. To answer this question, one must consider both the constitutional and statutory backdrop against which these errors occurred. The Illinois death penalty statute lists several aggravating factors which serve a constitutionally necessary function–to narrow the death eligible class. See 720 ILCS 5/9–1(b) (West 1992); 
People v. Lewis
, 88 Ill. 2d 129, 145 (1981). Under the statute and the court decisions interpreting it, the State is required to prove, beyond a reasonable doubt, the existence of an aggravating factor, that is, a factor that makes the defendant subject to a death sentence in the first place. See 720 ILCS 5/9–1(f) (West 1992); 
People v. Simms
, 143 Ill. 2d 154 (1991); 
Stewart v. Peters
, 958 F.2d 1379 (7th Cir. 1992). Once the State has met this burden of proving an aggravating factor beyond a reasonable doubt, the sentence hearing moves to a second stage in which “a weighing of aggravating and mitigating factors presented by the State and defendant is to occur, and the State has no burden of proving that the weight of these factors is such that a death penalty should be imposed.” 
People v. Bean
, 137 Ill. 2d 65, 138 (1990). This court has recognized that, by virtue of this second stage of the hearing, our death penalty statute places upon the defendant a burden of persuasion to dissuade the jury from imposing a sentence of death. However, both this court and the Seventh Circuit Court of Appeals have found that the imposition of such a burden of persuasion upon the defendant passes constitutional muster “because at this point in the hearing the prosecution has already proven beyond a reasonable doubt that a statutory aggravating factor exists [which] mak[es] the defendant eligible for the death penalty.” 
Bean
, 137 Ill. 2d at 139; 
Silagy v. Peters
, 905 F.2d 986, 998 (7th Cir. 1990). Thus, the existence of aggravating factors and the State's burden of proof during the eligibility phase of the hearing serve as important constitutional safeguards within the framework of our death penalty statute.

In this case, the State sought to establish defendant's death eligibility on the basis that the murder was committed in the course of another felony. Under our death penalty statute, however, it is not enough that the murder occurred during an armed robbery, a burglary or a residential burglary for the existence of this aggravating factor to be proved. The State must also prove that defendant “acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another.” 720 ILCS 5/9–1(b)(6)(b) (West 1992). Thus, at the eligibility stage of a death sentence hearing, the State “shoulder[s] the burden all over again” that defendant really did intend to kill his victim or create a strong probability of death. 
Stewart v. Peters
, 958 F.2d at 1387. The importance of this 
mens rea
 requirement cannot be minimalized. As the United States Supreme Court has recognized:

“A critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime. Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished.” 
Tison v. Arizona
, 481 U.S. 137, 156, 95 L. Ed. 2d 127, 143, 107 S. Ct. 1676, 1687 (1987).

The problem in this case stems from the fact that defendant's sentencing jury was never instructed that it had to find “all over again” that defendant intended to kill his victim or that defendant acted with the knowledge that his conduct created a probability of death or great bodily harm. Nor was it asked to evaluate the purposefulness of defendant's conduct in order to establish the individualized determination required in capital cases. See slip op. at 11 (setting forth text of issues instruction given to the jury). Instead, the jury was told that it could find defendant eligible for the death penalty if it found that the murdered individual was actually killed by the defendant and the other felony was armed robbery, residential burglary, or burglary. This instruction, without more, tells the jury that the defendant's 
mens rea
 is not relevant to its eligibility decision. But, as the previously cited case law makes clear, a defendant's 
mens rea
 is indeed relevant to the trier of fact's determination during the eligibility phase of a capital sentence hearing. Moreover, the State's burden of proving this element beyond a reasonable doubt is also relevant for purposes of satisfying constitutional requirements inherent to capital sentencing. For these reasons, this court has held that where an essential element that the State is required to prove in order to establish the existence of an aggravating factor is omitted from the jury's instruction, the subsequent death sentence must be vacated. 
People v. Ramey
, 151 Ill. 2d 498, 545 (1992).

My colleagues do not dispute that under our decision in 
Ramey
, a defendant's death sentence must be vacated where “[a]n essential element which the State was required to prove in order to establish the existence of the sixth aggravating factor – a culpable mental state–was not included in the instruction to the jury.” Slip op. at 12. Moreover, they admit that the complained-of instruction here, when compared with our death penalty statute and the appropriate Illinois Pattern Jury Instruction, clearly “did not contain the requisite language regarding the defendant's culpable mental state.” Slip op. at 12. Under the majority's view, however, vacatur of defendant's death sentence is unnecessary because defendant here, unlike defendant Ramey, failed to preserve the issue for appellate review. My colleagues, having found this issue waived, next conclude that our plain error rule (134 Ill. 2d R. 615(a)) does not operate to excuse the waiver because the evidence of defendant's guilt is “overwhelming” (slip op. at 13) and because “the sentencing jury was 
instructed
 on the issue of the defendant's intent at the guilt phase of the trial” so that the error did not deprive defendant of a fair trial. (Emphasis in original.) Slip op. at 13.

Although the majority chooses to evaluate defendant's procedural default under Rule 615(a) (see 134 Ill. 2d R. 615(a) (allowing excusal of waiver in cases where (i) the evidence is closely balanced or (ii) where the error deprived defendant of a substantial right)), I believe that the instructional error at issue here and condemned by this court in 
Ramey
 falls within the category of errors to which the waiver doctrine cannot apply and which are specifically excused under Supreme Court Rule 451(c) (134 Ill. 2d R. 451(c)). Rule 451(c) provides that “substantial defects” in jury instructions “are not waived by failure to make timely objections.” This rule provides a remedy for “grave” errors with regard to instructions in the same manner as Rule 615(a) does with respect to errors generally. See 
People v. Keene
, 169 Ill. 2d 1, 31 (1995). Under Rule 451(c), a procedural default will not bar review of an error in jury instructions involving a substantial right if to enforce the bar would work fundamental unfairness. 
Keene
, 169 Ill. 2d at 31;
 People v. Roberts
, 75 Ill. 2d 1, 12-14 (1979); 
People v. Jenkins
, 69 Ill. 2d 61, 66 (1977). In discussing Rule 451(c), this court has stated that the waiver rule “ `will not operate to deprive an accused of his constitutional rights of due process.' ” 
People v. Roberts
, 75 Ill. 2d at 14, quoting 
People v. Burson
, 11 Ill. 2d 360, 370 (1957). In my view, the instructional error at issue satisfies the “substantial defect” requirement contained in Rule 451(c) and mandates vacatur of defendant's death sentence in this case.

As the majority readily acknowledges, this court in 
Ramey
 concluded that the omission from death eligibility jury instructions of an essential element which the State was required to prove constituted an error serious enough to warrant vacatur of the death sentence. In reaching this holding in 
Ramey
, we rejected several arguments made by the State, which the majority inexplicably resurrects today to form the basis of its holding that the components of the plain error rule have not been met. This court's rationale for dismissing the State's contentions in 
Ramey
, however, demonstrates (i) the constitutional magnitude of the complained-of error and (ii) the reason why the error cannot be the subject of a procedural default. Therefore, I will address each 
seriatim
.

Relying on 
People v. Thompkins
, 121 Ill. 2d 401 (1988), the State in 
Ramey
 first maintained that the jury's return of a general verdict on the murder charge raised a presumption that the jury found that defendant intentionally murdered the victim. My colleagues today also rely on 
Thompkins
 for their conclusion that the general verdict raised the presumption that the jury found that defendant committed the most serious crime alleged, 
i.e.
, intentional murder, simply because the jury was instructed on the issue of intent during the guilt phase of the trial. See slip op. at 13. However, as we pointed out in 
Ramey
, our decision in 
Thompkins
 in no way supports such a conclusion. In 
Thompkins
, a jury returned a general verdict of guilty after being instructed as to intentional, knowing, and felony murder during the guilt phase of the trial. At sentencing, the trial judge, sitting as the trier of fact, found defendant eligible for the death penalty after determining that defendant intentionally killed the victims. This court held that the jury's return of a general verdict did not preclude the death penalty. 
Thompkins
, 121 Ill. 2d at 456. In 
Thompkins
, the circuit court, sitting as the trier of fact during sentencing, did in fact make the mental culpability finding required under the death penalty statute, whereas in both 
Ramey
 and the case at bar, the sentencing 
jury
, sitting as the trier of fact, never found that the defendant acted intentionally or knowingly with respect to death eligibility. For this reason, 
Thompkins
 is as inapposite to the facts in this case as it was to the facts in 
Ramey
.

Nevertheless, my colleagues use 
Thompkins
 to conclude that defendant was not substantially prejudiced by the complained-of errors. However, I find the rationale for their conclusion, 
i.e.
, that the erroneous instructions during the eligibility phase and the tendered general verdict form “did not deprive defendant of a fair trial” because the jury received instructions concerning the defendant's intent and returned a general verdict during the guilt phase (slip op. at 13), to be untenable. A general verdict returned by the jury in the guilt phase of the trial does nothing to diminish the amplitude of the instructional error at sentencing because the two stages of the proceedings address two very different questions. During the guilt phase of the trial, the trier of fact must determine whether the State has satisfied its burden of proving defendant guilty of the commission of the crime beyond a reasonable doubt. At the death eligibility stage of the proceedings, the trier of fact is concerned solely with determining whether the State has proved defendant eligible for the death penalty beyond a reasonable doubt. In this case, the fact remains that the sentencing jury was not instructed to consider, in any way, defendant's mental state during the eligibility phase of the trial. Moreover, the jury was not asked to make the requisite culpability finding in its verdict. Stated differently, the given instructions failed to inform the jury that the State was required to “shoulder” its burden on defendant's mental culpability “all over again.” Although the jury received instructions during the guilt phase of the trial as to intentional, knowing, and felony murder; its general verdict cannot imply unanimity as to any one count or theory. See 
People v. Sims
, 143 Ill. 2d 154, 170 (1991). The existence of the general verdict rendered in the guilt phase of the trial does not “make up” for the failings of the eligibility instructions during the sentencing phase of the proceedings. Given the constitutional ramifications of this error and the framework of our death penalty statute, I cannot but conclude that the complained-of errors were substantial enough and grave enough to have deprived defendant of a fair sentence hearing.

As I stated previously, I would invoke Rule 451(c) to excuse defendant's procedural default in this case even though my colleagues elect to use the more general plain error rule in considering this same question. Nevertheless, defendant's procedural default would still be excused under our plain error rule, notwithstanding my colleagues' conclusion to the contrary. According to the majority, the first prong of the plain error rule, 
i.e.
, whether the evidence is closely balanced, is not satisfied in this case. I question the relevance of such an inquiry given the nature of the erroneous instruction. That the State adduced evidence of the requisite intent is immaterial if the trier of fact was never asked to make a finding as to the sufficiency of that evidence. I note that the State in 
Ramey
 specifically argued that the court's failure to instruct the jury on the subject of intent did not require reversal because under 
People v. Jones
, 81 Ill. 2d 1 (1979), defendant's intent “was manifest from the evidence.” 
Ramey
, 151 Ill. 2d at 546. We rejected this argument due, in large part, to the fact that, in 
Jones
, defense counsel conceded that the intent to commit murder was blatantly evident and because the error was minimized by a correct instruction. None of these factors were present in 
Ramey
. For this reason, we concluded that “the error in the eligibility instructions cannot be considered harmless.” 
Ramey
, 151 Ill. 2d at 546-47. Notwithstanding this precedent, my colleagues hold that “the evidence of the defendant's guilt is overwhelming” and that “[i]t is clear from the record that the defendant 
intended
 to kill his victim.” (Emphasis in original.) Slip op. at 13. That may well be, but presenting evidence in and of itself is not the same as instructing the jury that it must find, 
from that evidence
, that defendant possessed a certain type of 
mens rea
 before declaring him eligible for the death penalty. My colleagues seemingly suggest that because the record contains evidence which could support a finding of intent to kill, this court can simply affirm the jury's finding of death eligibility even though the instructions did not require the jury to consider the question of defendant's mental culpability. Such an approach amounts to nothing more than directing a verdict for the prosecution, which, in my view, is impermissible under these circumstances.

I should also point out that the majority finds that the requisite intent to kill was present in this case despite the fact that this court in 
Ramey
 specifically declined the State's request that this court make the necessary intent finding itself and affirm defendant Ramey's death sentence. See 
Ramey
, 151 Ill. 2d 547. In rejecting the State's invitation, we noted that

“[w]hile this court independently evaluates the record when a death sentence has been imposed [citation], this court acts as a court of review and, as such, we defer to the findings made in the trial court when there is ample support in the record. [Citation.] According to the death penalty statute, the trial court or the jury has the responsibility of deciding whether the defendant is eligible for a death sentence. [Citation.]” 
Ramey
, 151 Ill. 2d at 549-50.

While I may agree with my colleagues that the evidence of defendant's intent to kill his victim is overwhelming, I must emphasize that this conclusion is not mine to make in the first instance. Illinois law requires the State to prove the requisite culpable mental state for death eligibility beyond a reasonable doubt, and the law also entitles the defendant, if he or she so chooses, to have a jury make that finding. Defendant here elected to have a jury do just that. Thus, the question is one exclusively reserved to the jury in which defendant has a protected liberty interest. See 
Ramey
, 151 Ill. 2d at 547. As a result, due process concerns are implicated. See 
Ramey
, 151 Ill. 2d at 547-49. In my view, 
Ramey
 compels the conclusion that the instructional errors in this case cannot be barred from review by the waiver doctrine because the errors are of a fundamental and substantial nature.

II

The majority's treatment of this issue today also runs counter to this court's decision in 
People v. Mack
, 167 Ill. 2d 525 (1995). In 
Mack
, the State sought to establish defendant's eligibility for the death penalty on the basis that the murder was committed in the course of another felony. As in this case, the verdict form failed to specify that the defendant acted with the requisite mental state or knowledge as required under section 9–1(b)(6)(b) of the Criminal Code of 1961. 
Mack
, 167 Ill. 2d at 529-30. Unlike this case, however, the jury in 
Mack
 was given a proper issues instruction which specifically mentioned the need to find that defendant possessed the requisite mental culpability before eligibility could be found. Defendant Mack did not challenge the sufficiency of the jury's eligibility stage verdict in his direct appeal; however, he included the issue in his subsequent post-conviction petition, claiming that appellate counsel's failure to raise the issue deprived him of his constitutional right to effective assistance of counsel. 
Mack
, 167 Ill. 2d at 530. As a result, we considered the verdict form error on its merits and concluded that counsel's error constituted deficient performance. In so holding, we stated the following:

“This court has emphasized that a culpable mental state of intent to kill or knowledge of a strong probability of death or great bodily harm is an essential element of the particular statutory aggravating factor upon which defendant's eligibility for the death penalty was ostensibly based. [Citations.] Moreover, this court has specifically held that an attorney's apparent misunderstanding of this mental state requirement fell outside the range of competence demanded of attorneys in criminal cases. [Citation.] Notwithstanding the absence of case law involving the precise defect at issue here, we believe that a competent attorney would have recognized the 
fundamental importance of a legally sufficient eligibility-stage verdict representing a finding on all essential elements of the statutory aggravating factor at issue
. In our view, appellate counsel's failure to seek reversal of defendant's death sentence on the basis of the defective eligibility-stage verdict was patently erroneous.” (Emphasis added.) 
Mack
, 167 Ill. 2d at 533.

Implicit in this holding is the recognition that this type of error is not one that is readily apparent to the average criminal defendant and that therefore it is incumbent upon defendant's attorneys, not to mention the trial judge, to guard against it. In my view, the tenor of these statements indicates that this court has, at least up until today, deemed the omission of the requisite mental state language from the death eligibility jury verdict form to be an error of “fundamental” proportion.

Moreover, given the above characterization of the error, it is not surprising that this court had little trouble in finding that defendant Mack established prejudice from counsel's failure to raise the error. See 
Mack
, 167 Ill. 2d at 538. We concluded that had appellate counsel included the issue in the direct appeal, a reasonable probability existed that the death sentence would have been reversed. 
Mack
, 167 Ill. 2d at 534-39. In reaching this conclusion, we acknowledged the constitutional implications concerning the question of the sufficiency of the sentencing jury's verdict. See 
Mack
, 167 Ill. 2d at 534 (and federal cases cited therein). Moreover, we rejected the State's assertion that the error was cured by the inclusion of the requisite mental state in the issue instruction given to the jury, stating that “the interpretative process should not become a speculative attempt to reconstruct the jury's deliberations and divine its unexpressed conclusions.” 
Mack
, 167 Ill. 2d at 536-37. If, during post-conviction proceedings, this court views appellate counsel's failure to raise this issue on direct review as ineffective assistance of counsel, then surely the same error, on direct appeal, can only be viewed as “substantial” enough to excuse its procedural default at trial. Moreover, I find it telling that a majority of this court in 
Mack
 deemed the error in the verdict form 
alone
 serious enough to mandate vacatur of the death sentence, notwithstanding the inclusion of the requisite mental state language in the instructions. I am puzzled, therefore, by my colleagues' refusal to excuse defendant's procedural default in the instant case where 
both
 the issues instruction and the jury's verdict form omitted the requisite language. 

Our decision in 
Mack
 also instructs us that, contrary to the majority's holding, this court lacks the ability to glean the requisite intent for a finding of death eligibility from the evidence adduced during the course of the trial. As I stated previously, my colleagues today hold that “[i]t is clear from the record that defendant 
intended
 to kill his victim.” (Emphasis in original.) Slip op. at 13. This court specifically concluded in 
Mack
 that such an eligibility verdict could not withstand scrutiny and stated that:

“[i]n reaching our decision, we are not unaware of the 
strength
 of the evidence relative to defendant's state of mind when he killed [the victim]. Indeed, in the opinion in defendant's direct appeal, this court remarked that defendant's testimony at the aggravation/mitigation stage of sentencing that the fatal shot was accidental was 'impossible to accept in view of the other evidence in the case.' [Citation.] However, *** the State has limited its argument to the sufficiency of the jury's verdict. The State has not argued that an insufficient verdict could be deemed harmless error based on the strength of the evidence, and the availability of a harmless error analysis in this setting is doubtful at best. Review under the harmless error rule presupposes an 
actual
 verdict. `The inquiry *** is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in 
this
 trial was surely unattributable to the error.' (Emphasis in original.) 
Sullivan v. Louisiana
 (1993), 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189, 113 S. Ct. 2078, 2081 (where constitutionally defective instruction on definition of reasonable doubt vitiated the jury's verdict, the harmless error rule did not apply); see also 
Williams v. Calderon
 (9th Cir. 1995), 52 F.3d 1465, 1477 (citing 
Sullivan
 in support of conclusion that error in instruction which omitted an element of statutory aggravating factor was not cured by State court's determination that evidence was so overwhelming that no rational, properly instructed jury could have failed to find the omitted element).” 
Mack
, 167 Ill. 2d at 538-39.

These statements amply illustrate why my colleagues' finding that the evidence was not closely balanced in this case (see slip op. at 13) is wholly irrelevant in the context of this particular type of error. Rather, the inquiry must focus solely on whether the instructional error was substantial enough to fall within the purview of either Supreme Court Rule 451(c) or the second prong of the plain error rule. In my opinion, this court's decision in 
Mack
 compels the conclusion that it does.

III

My research reveals that, in the past, this court has not hesitated to vacate a death sentence when the jury's eligibility verdict is legally insufficient and when the jury has not been instructed on the mental culpability required to prove the existence of a statutory aggravating factor during the eligibility phase of the hearing. Today's decision marks a radical departure from these precedents, not on the basis of better reasoning, but solely on the principle of 
ipse dixit
–it is so because the majority says it is so. I, for one, do not see any principled distinction between this case and 
Ramey
, waiver notwithstanding. Nor do I see any consistency in holding as we did in 
Mack
 that an attorney's failure to raise this issue on direct review constitutes ineffective assistance of counsel and in holding today that the same error does not rise to “plain error” when procedurally defaulted at trial. Although appellate counsel here properly based their arguments in this direct appeal on our decision in 
Ramey
, it would now appear that counsel, in so doing, may have done defendant a grave disservice because any relief seemingly available under 
Mack
 may now be jeopardized by principles of 
res judicata
. Accordingly, I respectfully dissent from the majority's decision to affirm defendant's death sentence.

JUSTICE McMORROW joins in this partial concurrence and partial dissent.

FOOTNOTES
1:
The circuit court also sentenced the defendant to concurrent terms of 30 years for robbery, 15 years for residential burglary, and 7 years for burglary.

2:
Makowski was charged in the same indictment as the defendant and subsequently entered a blind guilty plea to one count of first degree murder, armed robbery and residential burglary. The trial court sentenced him to 60 years in prison.

3:
Supreme Court Rule 451(c) provides that “substantial defects” in jury instructions “are not waived by failure to make timely objections thereto if the interests of justice require.” 134 Ill. 2d R. 451(c). This court has consistently emphasized the limited nature of Rule 415(c) and has restricted its application to the correction of “grave errors” or to situations where the case is close factually and there is a question of fundamental fairness. See 
People v. Easley, 
148 Ill. 2d 281, 337 (1992); 
People v. Huckstead
, 91 Ill. 2d 536, 544 (1982). Thus, Rule 451(c) offers a remedy for “grave errors,” which parallels Rule 615(a)'s remedy for plain errors generally, and we construe Rule 451(c) and Rule 615(a) “identically.” 
People v. Keene
, 169 Ill. 2d 1, 31-32 (1995) (Freeman, J.).