# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black; padding:1em;">

***People v. Taylor*, 2019 IL App (3d) 160708**

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHAWN MICHAEL TAYLOR, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0708 |
| Filed | June 18, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 16-CF-395; the Hon. John P. Vespa, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Matthew Lemke, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jerry Brady, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE WRIGHT delivered the judgment of the court, with opinion.<br>Justices McDade and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Shawn Michael Taylor, challenges his conviction for attempted residential burglary and requests a new trial. On appeal, he argues that an officer's reference to reading his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) violated defendant's fifth amendment rights, as well as Illinois's prohibition on postarrest silence. He also argues that the State, in closing arguments, improperly shifted the burden of proof. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    The State charged defendant via indictment with attempted residential burglary (720 ILCS 5/8-4(a), 19-3 (West 2016)). The indictment alleged that defendant removed glass from a window and cut the screen on a door to the home of Linda and Charles Kuhn, with the intent to unlawfully enter and commit a theft therein. Defendant's jury trial commenced on August 23, 2016.

¶ 4    At trial, Charles Kuhn testified that he was 71 years old. In the early morning hours on May 26, 2016, he and his wife were asleep. He was awoken around midnight when he heard a loud sound, "like a loud bang or *** something hitting the house." This sound was followed by "heavy pounding [or] heavy kicking" on the house. He testified that this banging sound recurred at least 10 times. Charles looked outside and saw two individuals leaving his backyard. Charles testified he did not go back to sleep. Around 1 a.m., he heard more noise coming from the backyard. He looked out and saw two people standing near the corner of his deck. He called 911.

¶ 5    When officers arrived, Charles inspected the perimeter of his house with them. They discovered that the screens on a back door and an adjacent laundry room door had been cut. They also discovered that panes of glass had been pried from a window and were lying broken on the ground. Some motion-activated floodlights on the exterior of the house had been unscrewed.

¶ 6    Brian Richards of the Peoria Police Department testified that he and Officer Dave Buchanan arrived on the scene and proceeded separately on foot. Richards heard Buchanan yell that he was pursuing two people running southbound. Richards proceeded to the south of the Kuhn residence and saw a male running and wearing a dark hooded sweatshirt and khaki pants. Richards testified that he had come into contact with defendant later that night, and that he was wearing clothing similar to the person he had observed running away from him.

¶ 7    On cross-examination, defense counsel engaged in the following colloquy with Richards:

"Q. Now, you stated that you had occasion to meet with [defendant] later. When was that?

A. When he was brought to Teton and University in a squad car.

Q. About what time would that have been?

A. Probably 1:10 approximately.

Q. Okay. So not long after you got there?

A. Correct.

Q. And how close were you to [defendant]?

A. Feet.

Q. Feet? What was the nature—feet. Okay. Well, like 10 feet, 5 feet, 6 feet?

A. 5 feet approximately. I stood on the outside of the squad car. He was on the inside. I leaned in to talk to him to read him his *Miranda* rights. He—"

¶ 8    Defense counsel cut Richards off and asked the court to approach the bench. The attorneys joined the court in chambers. Defense counsel asked for a mistrial based upon Richards's reference to the *Miranda* warning. The court agreed that Richards's comment was unresponsive to counsel's question and that counsel therefore did not invite the comment. However, the court denied the motion for mistrial, pointing out that Richards's mention of *Miranda* could not "possibly reflect negatively on the Defendant."

¶ 9    The court then considered what it would convey to the jury upon returning to the courtroom. It concluded: "I think if I go in there now and instruct them to disregard as being non-responsive, I do more harm than good." The court asked defense counsel if he agreed with that course of action, and counsel replied that he did. After returning to the courtroom, the court told the jury only that the attorneys "went into my chambers for a couple of minutes, and that issue has been resolved."

¶ 10    The State offered testimony from a number of other officers who confirmed that defendant was detained in the vicinity of the Kuhn residence. The evidence established that defendant was sweating and out of breath and wearing clothes matching the description provided by Richards. A pair of scissors was discovered in defendant's pocket. A thumbprint subsequently retrieved from the removed glass was found to be a match to defendant.

¶ 11    Defendant testified in his own defense. He testified he had been drinking alcohol for most of the day. That evening, an acquaintance named Dre told him that a person named Swag had "put their hands on" defendant's former girlfriend. Defendant testified that this angered him, explaining: "I have over 20 sisters, sir, and I'm like the only boy, so it's like putting your hands on my sister, and it just made me mad." Dre then showed defendant where Swag lived. The house that Dre identified as Swag's was actually the Kuhns' house.

¶ 12    Defendant banged on the back door because he wanted Swag to come out so they could fight. When no one answered the door, defendant and Dre walked 10 to 15 minutes back to where they had previously been. After drinking more alcohol, defendant, Dre, and a third person returned to the house. Defendant denied having a pair of scissors. He eventually cut a screen and removed a window pane, both in an attempt to draw Swag outside. Defendant testified that he never attempted or intended to enter the house.

¶ 13    The case proceeded to closing arguments following defendant's testimony. At the commencement of its rebuttal argument, the State declared:

"Good grief. Ladies and gentlemen, we ask you to do a lot of stuff. We ask you to pay attention. We ask you to listen to the evidence. We asked you to follow the rules. We ask you to be here at a certain time and get stuck in that room. What we don't ask you is to leave your common sense at the door of that jury room. We don't ask you to leave your common sense out here when you go back in there to deliberate. And when you use your common sense and you think about these things, it's pretty clear how ridiculous this whole Swag story is. And believe me, I could go on and on and on about how ridiculous that is, but that wouldn't get us anywhere, because I have a feeling that you've already come to that conclusion about how ridiculous that is, but the Defendant

needs you to believe that story. The State needs to prove this case beyond a reasonable doubt."

Defense counsel objected, arguing the State had improperly shifted the burden of proof to defendant. The court denied the objection.

¶ 14 The jury found defendant guilty. Defendant filed a motion for new trial in which he cited Richards's testimony and the State's closing argument as grounds for a new trial. The court denied the motion and later sentenced defendant to a term of 11 years' imprisonment.

¶ 15 II. ANALYSIS

¶ 16 On appeal, defendant argues he is entitled to a new trial on two grounds. First, he contends that a prosecution witness's nonresponsive reference to defendant's *Miranda* rights during cross-examination violated his fifth amendment right to remain silent and Illinois's prohibition on evidence of postarrest silence. Defendant also argues the State's rebuttal argument improperly shifted the burden of proof to defendant. We address each argument in turn.

¶ 17 A. *Miranda* Testimony

¶ 18 In *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), the United States Supreme Court held that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." In that case, the prosecutor had attempted to cast doubt on defendant's version of events by asking why, if defendant had an innocent explanation for his conduct, he did not immediately relay it to the police. *Id.* at 613-14. The Court reasoned that allowing the State to attack a defendant's testimony on those grounds would be, essentially, to punish defendant for the exercise of his right to remain silent. *Id.* at 618. The Court concluded: "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id.* The Supreme Court would subsequently make clear that the *Doyle* rule only applied to a defendant's silence after *Miranda* warnings had been issued. *Fletcher v. Weir*, 455 U.S. 603, 607 (1982).

¶ 19 Notably, in Illinois, impeachment via evidence of postarrest silence is inadmissible as a matter of evidentiary law. *People v. Clark*, 335 Ill. App. 3d 758, 762 (2002). This doctrine is premised upon the notion that "such evidence is neither material nor relevant, having no tendency to prove or disprove the charge against a defendant." *People v. McMullin*, 138 Ill. App. 3d 872, 876 (1985). The Illinois rule predates *Miranda*, and thus applies regardless of the delivery of *Miranda* warnings. *Id.* ("[I]t is also apparent that the rule they set forth does not depend upon whether the silence sought to be utilized occurred before or after a defendant was given *Miranda* warnings.").

¶ 20 The *Doyle* rule has been applied even where impeachment is not at issue. In *People v. Herrett*, 137 Ill. 2d 195, 213 (1990), during closing argument, the State asked the jury to consider why, if defendant was innocent, he did not explain as much to the police upon his arrest. Our supreme court held that those improper "remarks invited the jury to view the defendant's post-arrest silence as a tacit admission of guilt" and thus ran afoul of the fifth amendment and the *Doyle* rule. *Id.*

¶ 21 In the instant case, defense counsel asked Richards, during cross-examination, to explain the distance separating the officer and defendant at a certain point in time. As a preface to his

response, Richards explained that he "leaned in to talk to [defendant] to read him his *Miranda* rights." Defense counsel truncated the officer's answer, suspending cross-examination for a moment as both parties approached the bench. The court denied defense counsel's request for a mistrial due to the officer's nonresponsive answer.

¶ 22    Now, on appeal, defendant contends that the mere mention of *Miranda* runs afoul of *Doyle* and the Illinois rule prohibiting evidence of postarrest silence. He argues:

"The *Miranda* warning testimony undermined [defendant's] credibility because it led the jury to consider whether [defendant] gave the same explanation to police that he testified to at trial. In the absence of any such evidence, the jury was left to speculate why no post-*Miranda* explanation statement was made. Absent any explanation, the jury was led to conclude that [defendant] did not give the police the same explanation, did not speak with investigators, and was therefore guilty."

¶ 23    This argument is unavailing. We are aware of no cases that support defendant's assertion that the mere mention of *Miranda* warnings is a violation of a defendant's constitutional rights requiring a new trial. The touchstone of the *Doyle* rule is not the delivery of the *Miranda* warnings or even a defendant's postarrest or postwarning silence. Rather, that doctrine concerns the *State's utilization* of such evidence at trial. After all, the *Doyle* court held explicitly that it would be unconstitutional to allow postarrest silence "*to be used* to impeach an explanation subsequently offered at trial." (Emphasis added.) *Doyle*, 426 U.S. at 618. The language employed by our supreme court in this context is similarly instructive. In *Herrett*, 137 Ill. 2d at 213, the court noted that the State's closing argument "*invited the jury* to view the defendant's post-arrest silence as a tacit admission of guilt." (Emphasis added.) The same is no less true in regard to the Illinois evidentiary rule. *McMullin*, 138 Ill. App. 3d at 876 (referring to "the silence sought to be utilized").

¶ 24    Significantly, Richards did not complete his answer on cross-examination and the jury did not learn whether Richards actually recited the *Miranda* warnings while leaning into the vehicle. Most importantly, there was absolutely no testimony from Richards, nor argument by the State, regarding defendant's silence following the administration of the *Miranda* warnings. Simply put, there was no direct or inferential evidence of defendant's silence presented to this jury for consideration. This element of utilization of defendant's silence by the prosecution, following *Miranda* or placement under arrest, is absent. Instead, the testimony consisted of a single reference to *Miranda* warnings without a comment on whether the warnings were effectuated or whether silence followed defendant's arrest.

¶ 25    Next, we address defendant's assertion that the short sidebar with the trial judge in this case "highlighted and thus intensified by the subsequent break in testimony." Defendant claims that after the chambers conference the jury may have considered the "seemingly unresolved objection." With respect to the "seemingly unresolved objection," the record makes quite clear that the circuit court considered the appropriate course of action and concluded that addressing the *Miranda* comment any further in front of the jury would only serve to highlight it more. Further, it was undoubtedly proper for the objection to be heard outside the presence of the jury. It is unclear what other method defendant would suggest. Not only did defense counsel fail to request a curative instruction, he affirmatively concurred with the court's decision to not give one.

¶ 26    We recognize that a modern jury is likely to have at least a passing familiarity with the term "*Miranda* warnings" from popular media. Based on contemporary culture, the common

misconception of the public is that *Miranda* warnings must be immediately recited by the arresting officer, in Dragnet fashion, following every arrest. The mere mention of the concept of *Miranda* warnings in this record did not give rise to any inference or otherwise imply defendant was silent following the *Miranda* warnings the officer may have recited and therefore does not amount to automatic reversible error, constitutional or otherwise.

¶ 27                                    B. Closing Arguments

¶ 28      Defendant next argues the prosecutor's closing argument improperly shifted the burden of proof from the State to defendant by stating, "[D]efendant needs you to believe that story." The State contends the prosecutor's comment, when considered in context, was proper and did not shift the burden of proof. Alternatively, the State argues that the error, if any, attributable to this single statement was harmless.

¶ 29                                    1. Standard of Review

¶ 30      The parties dispute the standard of review. The State relies on the abuse of discretion standard used by our supreme court when reviewing the propriety of the State's closing arguments in *People v. Simms*, 192 Ill. 2d 348, 397 (2000). In contrast, the defense urges this court to apply a *de novo* standard of review pursuant to our supreme court's decision in *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). Recognizing our supreme court has applied two different standards of review when evaluating closing arguments in criminal cases, other courts have observed that the language in *Wheeler* seems to conflict with past precedent when the court scrutinized errors attributed to the prosecutor's closing argument. *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009); *People v. Legore*, 2013 IL App (2d) 111038, ¶ 48. We disagree.

¶ 31      Respectfully, we conclude that our supreme court has consistently followed a two-step process for preserved error when determining (1) whether the prosecutor's closing argument was improper and (2) whether the improper commentary by the State unfairly prejudiced defendant's right to have a fair trial. This two-step analysis begins by first using an abuse of discretion standard determining whether prosecutorial error is present in the record. This standard gives deference to the trial court's ruling. An example of the first step of a closing argument analysis can be seen in *People v. Blue*, 189 Ill. 2d 99 (2000). In *Blue*, the court observed that " 'the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion.' " *Id.* at 128 (quoting *People v. Byron*, 164 Ill. 2d 279, 295 (1995)); see also *Simms*, 192 Ill. 2d at 397. If prosecutorial error is present in the State's summation, the reviewing court moves on to the second step of the analysis.

¶ 32      The second step of a closing argument analysis applies a *de novo* standard of review to decide whether the prosecutorial error contained in the closing arguments created substantial prejudice to defendant, rendering defendant's trial unfair. An example of this second step of the analysis can be seen in *Wheeler*, 226 Ill. 2d at 121. In *Wheeler*, the court observed that: "Whether statements made by a prosecutor at closing argument *were so egregious that they warrant a new trial* is a legal issue this court reviews *de novo*." (Emphasis added.) *Id.*

¶ 33      A brief summary of the unique record in *Wheeler* may be helpful at this juncture. In *Wheeler*, defense counsel made multiple objections during the State's closing arguments. On appeal, Wheeler identified 27 prosecutorial errors in the State's closing argument. *Id.* at 109-13. Some, but not all, of the defense's objections were *sustained* by the circuit court. *Id.* Some, but not all, of the overruled defense's objections were preserved for review.

¶ 34 In *Wheeler*, our supreme court carefully emphasized that it would only consider preserved errors when deciding whether prejudice arose from the prosecutor's summation. *Id.* at 122. Similarly, in the case at bar, we are considering preserved error alone.

¶ 35 In *Wheeler*, the appellate prosecutor was confronted with a pattern of prosecutorial conduct that would be difficult to defend. Consequently, the appellate prosecutor did not defend the State's closing argument as proper, unlike this appeal. The appellate prosecutor in *Wheeler* argued "that the portions of the prosecutor's closing argument that were preserved for review, *even if viewed as improper*, were not so egregious that they created an unfair trial or were a material factor in the verdict." (Emphasis added.) *Id.* at 127. In other words, the appellate prosecutor asked the supreme court to find that the preserved errors attributable to improper summation by the State were harmless and did not detract from the fairness of the trial. The first step of the closing argument became a mere formality because the State adopted a view based on presumptive prosecutorial misconduct that existed in the record.

¶ 36 Due to this approach by the appellate prosecutor in *Wheeler*, our supreme court had no reason to dwell on the first step in the two-step analysis. We also note that in *Wheeler*, the trial court *sustained* some, but not all, of the defense's objections to the prosecutor's closing remarks, thereby deciding some of the remarks *were* improper.

¶ 37 Therefore, unlike the case at bar, the *Wheeler* court necessarily focused almost exclusively on the second step, namely, the determination of substantial prejudice. This focus on the second step of the analysis, the question of prejudice, is clearly reflected in the following statement by the *Wheeler* court regarding the standard of review: "Whether statements made by a prosecutor at closing argument *were so egregious that they warrant a new trial* is a legal issue this court reviews *de novo*." (Emphasis added.) *Id.* at 121.

¶ 38 Simply stated, the purported conflict in our supreme court's approach to the standard of review in *Wheeler*, *Blue*, and *Simms* seems unfounded. Instead, *Wheeler* involved a different standard of review because *Wheeler* addressed the second step of a closing argument analysis, while *Blue* and *Simms* addressed the first step of a two-step analysis. In *People v. Cook*, 2018 IL App (1st) 142134, at least one reviewing court reached the same conclusion that we reach today. In *Cook*, the court stated,

> "Whereas a reviewing court applies an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument [citations], a court reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial [citation]. Our supreme court has not created any conflict about the appropriate standard of review to be applied to these two different issues." *Id.* ¶ 64.

We mirror the conclusion of the court in *Cook*. Our supreme court has not created any conflict regarding the appropriate standard of review in the two-step analysis involved in reviewing preserved error in the State's closing arguments.

¶ 39 Accordingly, in this case we will first apply an abuse of discretion standard, as suggested by the State in this appeal, when determining whether a singular statement in the prosecutor's closing argument was proper or improper.

¶ 40                              2. First Step—Propriety of Prosecutor's Remarks

¶ 41     On appeal, defendant challenges the court's decision to overrule defense counsel's objection to the following statement by the prosecutor: "[T]he Defendant needs you to believe that story." The State maintains that our court must consider the comment in full context. The claims the State's comment should be viewed as a couplet: "Defendant needs you to believe that story. The State needs to prove this case beyond a reasonable doubt."

¶ 42     Obviously, the propriety of these two sentences in the State's closing argument turns on the emphasis of the prosecutor's voice when articulating the word "needs" in each sentence. Moreover, the context of the first statement may also depend on how quickly the second statement followed and reminded the jury of the State's high burden of proof.

¶ 43     By overruling defendant's objection to this singular isolated comment, the trial court found the State's summation did not shift the burden of proof and was proper argument. It is well established that the trial court is in the best position to evaluate the propriety of closing arguments in the context of a particular trial. See *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Granting deference to the circuit court's first-person observations, we conclude that the trial court's decision to overrule the defense objection was not arbitrary, fanciful, or unreasonable. See *People v. Donoho*, 204 Ill. 2d 159, 182 (2003) (defining abuse of discretion standard).

¶ 44     Since we have concluded the prosecutor's statement at issue did not constitute error, the second step, *de novo* review, is not required because the prosecutor's closing argument was proper.

¶ 45                                             III. CONCLUSION

¶ 46     The judgment of the circuit court of Peoria County is affirmed.

¶ 47     Affirmed.