2021 IL App (1st) 181938-U

No. 1-18-1938

Order filed June 23, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 60036 |
| | ) | |
| WILLIE POLK, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for home invasion is affirmed over his contention that the State's pervasive pattern of prosecutorial misconduct throughout closing and rebuttal arguments constitutes plain error.

¶ 2    Following a jury trial at which he represented himself, defendant Willie Polk was found guilty of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)) and aggravated battery (720 ILCS 5/12-3.05(a)(4) (West 2018)). The trial court, citing the one-act, one-crime doctrine, sentenced defendant to 10 years in prison for home invasion. On appeal, defendant contends that the State's

pervasive pattern of prosecutorial misconduct throughout its closing and rebuttal arguments constitutes plain error that warrants reversal and remand for a new trial. For the reasons that follow, we affirm.

¶ 3     Defendant's conviction arose from the January 5, 2018, beating of 63-year-old Teresa Rogers at her Chicago residence. Following his arrest, defendant was charged by information with home invasion, attempted aggravated battery, aggravated battery, attempted robbery, and unlawful restraint. Prior to trial, the State nol-prossed all counts save the count charging home invasion and the count charging aggravated battery. Also prior to defendant's trial, codefendant Derdra Brown pled guilty to attempted aggravated battery in exchange for a sentence of four years' imprisonment.

¶ 4     At trial, Rogers testified that on the date in question, she lived alone in a studio apartment in a women-only building. Around 10:30 p.m., she heard a knock at her door. When she opened the door, she saw Brown, who lived in the building and whom Rogers described as a "casual acquaintance," and a man she did not know, but identified in court as defendant. Rogers noticed a "[s]trong odor of alcohol" coming from Brown and defendant. Brown offered to give Rogers a poster, but Rogers declined. Brown and defendant left.

¶ 5     A short time later, Rogers heard another knock on her door. This time, when Rogers opened the door to Brown and defendant, Brown asked for a cigarette. Rogers told her to come back in a minute "so I can roll you a cigarette." About 10 minutes later, the pair returned. Rogers opened the door and gave Brown a cigarette. Brown then asked if Rogers would loan her money. Rogers said no, and Brown began "begging and pleading and trying to be very nice." When Rogers continued to refuse, Brown got "very angry and very loud and very aggressive," repeating, "I know you have money, I know you have money, you always have money." During this exchange,

Rogers's door was open about four inches, Brown was standing directly in front of it, and defendant was standing to the side.

¶ 6    Brown pushed at the door. Rogers tried to close it while telling Brown to stay out of her home. Brown pushed harder and, eventually, pushed her way into Rogers's apartment and started punching Rogers in the head "very fast and hard." Rogers fell to her knees, screamed for help, and tried to cover her head and get out of Brown's way. Defendant entered the apartment, closed and dead-bolted the door, and started walking toward Rogers.

¶ 7    Rogers, who "knew [she] was in serious trouble," continued screaming for help and for someone to call the police. Defendant did not pull Brown off Rogers or stop her from punching Rogers. Instead, he grabbed Rogers's wrists, preventing her from covering her head. Defendant pushed Rogers to her bed, pushed her onto it face-up, and lay on top of her. Brown produced a lighter, and as she was "flicking" it, threatened to burn Rogers's hair. While Rogers screamed, defendant punched her in the face "at least" twice and said, "[S]hut up or I'll pop you again."

¶ 8    At this point, Rogers heard "the desk clerk" pounding on the front door, screaming her name, and asking if she was okay. Defendant got up and ran out of the apartment. Brown, who continued to punch Rogers in the head, took a bottle of beer from the refrigerator and broke it over Rogers's head, above her right eyebrow. Eventually, police and paramedics arrived at the apartment's front door. When Brown heard them, she let Rogers go and ran to the door, where she told the first responders that Rogers had injured herself.

¶ 9    Rogers was taken to the hospital, where she was treated for her injuries, including severe bruising around her mouth and a broken finger on her left hand, which "didn't quite heal right." Rogers received stitches on her forehead and across her nose, and both her eyes were black and

swollen shut. In addition, Rogers began weekly sessions with a therapist for "emotional and mental reasons" due to the trauma from the assault.

¶ 10    In court, Rogers identified photographs of her apartment, including one depicting blood on her bed and one depicting the broken beer bottle. She also identified video clips depicting the hallway outside her apartment. According to Rogers, a clip time-stamped 10:42 p.m. showed defendant and Brown at her front door when Brown was asking for a cigarette, and then showed defendant and Brown walking away, toward Brown's apartment down the hall. She testified that a clip time-stamped 10:53 p.m. showed Brown at her door, with defendant behind her. According to Rogers, it was at this point that Brown asked for and then demanded money. Rogers testified that at 10:54 p.m. on the video, Brown struck her and she told Brown to get out of her home and pushed her. At 10:55 p.m., Brown struck her, Rogers tried to protect herself, and defendant entered her apartment.

¶ 11    The video clips, which were admitted into evidence and published to the jury, and are included in the record on appeal, depict the hallway outside Rogers's apartment. A clip time-stamped starting at 10:42 p.m. shows Brown and defendant approaching Rogers's door. Brown knocks on the door. Brown and Rogers remain outside the door for approximately two minutes before walking away and turning a corner. A clip time-stamped starting at 10:53 p.m. shows Brown and defendant approaching Rogers's door and Brown knocking on it. Brown enters the apartment while defendant stands in the hall a short distance from the doorway. At 10:54 p.m., Brown backs out of the doorway with Rogers's arm extended toward her chest. Brown leans forward and pushes herself back into the apartment. At 10:55 p.m., Rogers's back emerges from the doorway and it appears she is struggling. Defendant approaches the door and enters the apartment.

¶ 12    Karen Gill testified that she worked as a front desk clerk at Deborah's Place, a housing unit for women who suffer from being chronically homeless, and that her duties included checking the monitors every 15 minutes. She would also check the monitors when she was cleaning up her desk around 10:50 p.m., at the end of her shift. On the night in question, as she was preparing to leave, she looked at the monitors and noticed Brown and defendant, whom she identified in court, standing at Rogers's door.

¶ 13    Gill testified that at 10:58 p.m., while she was wiping down her work area, she received a phone call from Rogers's next-door neighbor, stating that she could hear people arguing in Rogers's apartment and Rogers screaming for help. Gill went upstairs to Rogers's apartment. As she approached, she heard Rogers screaming for help. Gill repeatedly knocked on the door, told "them" to open it, and called 911. She could hear scuffling, Rogers screaming, and defendant's and Brown's voices, but could not make out what they were saying. Gill then called the front desk. She told the clerk who had just arrived for the next shift that she had called 911 and asked her to give the police the master key. Gill continued to hear scuffling and banging noises from inside the apartment, as well as Rogers's repeated screams for help.

¶ 14    Gill identified a video clip time-stamped 11:03 p.m. She explained that the clip depicted defendant exiting the apartment, but holding on to the door. Gill testified that at this point in the clip, she asked defendant what was going on. Defendant told Gill that he and Brown were smoking crack with Rogers, that Rogers owed him money, and that he and Brown were trying to get the money from Rogers. Defendant did not let Gill inside and "got loud." Gill told defendant to calm down and tried to get him and Brown to leave the apartment, as she could hear glass breaking and Rogers still screaming for help. Defendant let go of the door, which shut behind him and locked

automatically. Gill and defendant both started knocking on the door. Eventually, Gill turned her attention to another tenant who had come into the hallway.

¶ 15 The video clip time-stamped 11:03 p.m., which was introduced into evidence and published to the jury, and is included in the record on appeal, depicts the hallway outside Rogers's apartment. After Gill knocks on the door, defendant emerges from the apartment and speaks with her while keeping one hand on the door. Following about 30 seconds of conversation, defendant lets go of the door. Defendant and Gill then knock on the door repeatedly.

¶ 16 Chicago police officer Valentino Cuevas testified that he and his partner, James Radomski, responded to a call of a person calling for help. They were buzzed into the building at the given address, were given a key, and went to the third floor. When they exited the elevator, they were met by Gill, who directed them to Rogers's apartment. Defendant, whom Cuevas identified in court, was standing outside the apartment's door. When the officers opened the door with the key, Brown exited the apartment. Cuevas could see Rogers inside, covered in blood and bleeding profusely from her head. He and his partner detained Brown.

¶ 17 Cuevas testified that he had been wearing a body camera, which was activated when he spoke with Rogers. In court, the State introduced into evidence and published the camera's footage to the jury. Cuevas agreed that the video truly and accurately depicted what he was doing and what he was hearing when he arrived at the apartment.

¶ 18 On the video, which is included in the record on appeal, Cuevas asks Rogers what happened. Rogers replies that her neighbor and a man came to her door and her neighbor asked for a cigarette. Rogers told them to come back in a minute. When they returned, the neighbor demanded money. Rogers said she did not have any money, at which point the neighbor pushed

her way inside Rogers's apartment. The man laid on top of her and punched her, and the neighbor punched her and hit her in the head with a bottle.

¶ 19    On cross-examination, Cuevas testified that when he first saw defendant standing in the hallway, defendant related that Rogers was inside the apartment, hitting her head against the wall. On re-direct, Cuevas stated that when he was inside the apartment, he did not see any damage to or blood on the wall.

¶ 20    Chicago police officer James Radomski testified that when he and Cuevas arrived on the third floor, defendant was with Gill in the hallway outside the apartment. When the officers opened the door, Brown and Rogers came out. Rogers was battered and covered in blood. Defendant and Brown tried to leave the scene. The officers detained Brown and Radomski rendered aid to Rogers. Radomski called for emergency medical services and eventually, Rogers was transported to the hospital.

¶ 21    Chicago police detective Richard Chorak testified that he inspected Rogers's apartment. He observed shattered glass on the floor in the kitchen area and a pool of blood on the bed.

¶ 22    Defendant testified that he had prior convictions for aggravated battery and retail theft. He had met Brown less than a month before the day in question, and did not know Rogers "at all." He explained that it "took [him] so long to open that door" when Gill was knocking on it because he was holding Brown. He stated that Rogers tried to reach around him to "get" Brown, and that Brown was trying to "get" Rogers. He wondered why Rogers was calling for help. One of the women "pull[ed] down stuff," causing glass to break. According to defendant, "this went on, on and on and on." He did what he could to break up the fight and keep Brown and Rogers separated.

He denied touching or "messing" with Rogers. He further stated that Rogers was not bleeding when he left her apartment.

¶ 23    On cross-examination, defendant insisted that the fight was exclusively between Rogers and Brown. He stated that he stepped into the apartment to try to stop the fight because Brown asked him to do so, but then stated it was Rogers who had made the request when she was on the ground. At some point, defendant threw Brown to the ground, retrieved a bag from the hallway outside the apartment, and re-entered the apartment. Later, he exited the apartment to speak with Gill. When asked whether he told Gill that Rogers owed him money, defendant answered, "That's a lie." Defendant stated that when Rogers testified he had held her down on the bed and punched her, "[T]hat was a lie."

¶ 24    Defendant acknowledged that he told the responding officers that Rogers was hurting herself and slamming her head against a wall, and that he did not tell the officers he had been attempting to break up a fight. He agreed that he lied to the officers, explaining, "I didn't want nobody to go to jail." He admitted that he was placed under arrest, transported to the police station, and given *Miranda* warnings, but denied making any subsequent statements. According to defendant, all of Rogers's injuries were inflicted after he left the apartment.

¶ 25    On redirect, defendant clarified the year of his prior conviction for aggravated battery, and stated that he also had prior convictions for possession of a stolen motor vehicle and for criminal damage to property.

¶ 26    In rebuttal, the State called Chicago police detective Richard Chorak, who testified that on January 6, 2018, he and a partner, Detective Kevin Rasmatan, interviewed defendant at the police station after advising him of his *Miranda* rights. Chorak identified a 19-minute electronic

recording of the interrogation, which was admitted into evidence. A "portion" of the recording was published to the jury.[1] Chorak testified that following the interview with defendant, he and his partner went to Rogers's apartment "to look for some of the stuff that [defendant] said was done in the apartment." The detectives found no blood on the wall where defendant said Rogers "was bleeding from." Although defendant had said there was shattered glass in the bathroom, the detectives only found shattered glass in the kitchen area.

¶ 27     The detectives returned to the station and interviewed defendant a second time. During that interview, which was also recorded, defendant related that he was "covering" for Brown. He said that Brown forced her way into Rogers's apartment and that the two women fought while he held the door open. When Brown started to fall to the ground, he entered the apartment to catch her and "put her back into the fight." At that point, the door closed. Brown and Rogers resumed fighting. Defendant "attempted to break up the fight, but without touching anybody." When defendant heard knocking on the door and recognized Gill's voice, he left the apartment. On cross-examination, Chorak agreed that defendant had "seemed pretty coherent" during the interviews.

¶ 28     After hearing closing arguments, the jury found defendant guilty of home invasion and aggravated battery. Following a hearing, the trial court, citing the one-act, one-crime doctrine, sentenced defendant to 10 years in prison for home invasion.

¶ 29     On appeal, defendant contends that the State's pervasive pattern of prosecutorial misconduct throughout its closing and rebuttal arguments constitutes plain error that warrants reversal and remand for a new trial. Specifically, he argues that the State (1) erroneously argued that pertinent elements of the offense were not in dispute, despite the fact that he repeatedly denied

---

[1] The record does not reflect which portion was published to the jury.

committing the crimes for which he stood trial; (2) improperly misstated the law; (3) improperly bolstered Rogers's credibility; and (4) made comments that were not based on the evidence and were made solely to inflame the jury and undermine the jurors' impartiality. He further argues that he was denied a fair and impartial trial due to the cumulative effect of the prosecution's repeated misconduct.

¶ 30    As an initial matter, defendant acknowledges that he did not object to the State's arguments at trial and did not include the issue in a posttrial motion. Nevertheless, he asserts that this court may reach the issue on appeal under either prong of the plain error doctrine. Under the plain error doctrine, a reviewing court may excuse a party's procedural default if a clear or obvious error has occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Staake*, 2017 IL 121755, ¶ 31. However, before we consider application of the plain error doctrine, we must determine whether any clear or obvious error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60. This is because " 'without error, there can be no plain error.' " *People v Wooden*, 2014 IL App (1st) 130907, ¶ 10 (quoting *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007)). Here, we find no error.

¶ 31    A defendant has the right to a trial free from improper prejudicial comments or arguments by the State during closing arguments. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). "Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial." *Id.* Prosecutors are allowed a great deal of latitude in making closing

arguments. *Id.* A prosecutor may comment on the evidence and may draw all legitimate inferences deducible therefrom, even when those comments and inferences are unfavorable to the defendant. *Id.* Even where a prosecutor's remarks may have exceeded the bounds of proper comment, the jury's verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different. *Id.* at 185. Remarks made during a closing argument must viewed not in isolation, but in the context of the entire argument. *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 47.

¶ 32    This court has acknowledged confusion regarding the applicable standard of review, in light of "seemingly contradictory statements" from supreme court precedent. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 47. In 2000, our supreme court stated that the trial court's determination of the propriety of remarks during closing argument "will not be disturbed absent a clear abuse of discretion." *People v. Blue*, 189 Ill. 2d 99, 128 (2000). However, our supreme court subsequently stated that "[w]hether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). In *Phagan*, this court determined that *Blue*'s abuse of discretion standard was better supported by precedent. *Phagan*, 2019 IL App (1st) 153031, ¶ 54 ("We follow *Blue* and review claims of prosecutorial misconduct in closing arguments under the abuse of discretion standard."). Other decisions of this court have concluded that there is no conflict between *Blue* and *Wheeler*, and that the two decisions can be reconciled. See, *e.g.*, *People v. Taylor*, 2019 IL App (3d) 160708, ¶¶ 30-32 (explaining there is a "two-step analysis" under which the reviewing court first applies an abuse of discretion standard in determining "whether prosecutorial error is present in the record" and that the second step "applies a *de novo* standard of

review to decide whether the prosecutorial error contained in the closing arguments created substantial prejudice to defendant"); *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64 ("Whereas a reviewing court applies an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument [citations], a court reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial [citation].").

¶ 33 In this case, we need not decide whether *Wheeler* or *Blue* defined the precise standard of review. This is because under either standard, we determine that the remarks challenged in this appeal did not constitute reversible error.

¶ 34 The first comment made by the State in closing arguments to which defendant is now objecting is as follows:

"There is *no question* that [defendant] and [Brown] were acting in concert. They went to [Rogers's] house not only once, twice, but three times and as [Brown] starts demanding money, as she starts getting loud, as she starts pushing into that apartment, [defendant] is just standing there. And then when they don't get the money, he forces, he goes into the apartment himself. There is *absolutely no question* that they were acting together and are responsible for one another's conduct." (Emphasis added.)

¶ 35 Defendant asserts that by making these comments—in particular, the emphasized phrases—the State erroneously argued that pertinent elements of "the offense" were not in dispute, when, in reality, defendant had repeatedly denied committing the crimes for which he stood trial. Specifically, he argues that "there absolutely was a question of whether [he] was acting in concert

with Brown," and, therefore, the State misinformed the jury by stating it was uncontested that he was legally responsible for Brown's actions.

¶ 36    We find that the prosecutor's remarks were a proper assertion of an opinion that the only inference to be raised from the evidence presented at trial was that defendant and Brown were acting together. This court's opinion in *People v. Hanson*, 44 Ill. App. 3d 977 (1977), is instructive. In *Hanson*, the State made the following remark in closing arguments: "These defendants were in the business of selling marijuana to other people, students, resident[s] of the WIU campus. *No question about it.* There is no contradictory evidence to that fact." (Emphasis added.) *Id.* at 985-86. On appeal, this court determined there was no impropriety, as the prosecutor was merely commenting on the evidence, suggesting the only inference he believed the jury could have raised from the evidence, and opining that there was no evidence from which a contrary inference could be raised. *Id.* at 986. Here, where the prosecutor made a similar remark, we also find no impropriety.

¶ 37    In reaching this conclusion, we reject defendant's reliance on *People v. Johnson*, 149 Ill. App. 3d 465 (1986). In *Johnson*, the State asserted in closing argument that the evidence showed "without contradiction" that the defendant shot the victim. *Id.* at 468. However, the evidence had included a contradiction, as the defendant had denied to a police officer that he shot the victim. *Id.* As such, this court agreed with the defendant that the State's assertion was improper. *Id. Johnson* is distinguishable because, in that case, the prosecutor did not argue an inference supported by the record, but rather, misstated the evidence as being uncontradicted. *Johnson*, 149 Ill. App. 3d at 468. Here, in contrast, the prosecutor argued an inference and did not misstate the evidence. As such, defendant's contention fails.

¶ 38    The second comment to which defendant objects in this appeal is as follows:

>    "Ladies and gentlemen, there is other evidence that they were not invited into that home. We have the aftermath. We have some pictures. Here is the front of [Rogers's] home. That's blood. A rug turned over. That's not what happens after you invite somebody into your home. The broken glass, the bloody bed."

¶ 39    Defendant argues that in making these remarks, the State misstated the law applicable to home invasion. He asserts that "aftermath" is not relevant to determining whether he had lawful authority to enter Rogers's apartment, as criminal actions engaged in by a defendant after entering with an innocent intent do not change the status of the entry. Defendant maintains that the State, by implying that a subsequent criminal act inherently negates an earlier grant of lawful authority, gave the jury the prejudicially erroneous impression that he could not possibly have had authority to enter. We disagree.

¶ 40    In order to prove home invasion as charged here, the State was required to prove beyond a reasonable doubt that, among other things, defendant knowingly entered Rogers's dwelling place without authority. 720 ILCS 5/19-6(a)(2) (West 2018). Defendant is correct that "where the defendant enters with an innocent intent, his entry is authorized, and criminal actions thereafter engaged in by the defendant do not change the status of the entry." *People v. Bush*, 157 Ill. 2d 248, 254 (1993). Nevertheless, the question of whether an entry was "without authority" may be proved by circumstantial evidence, and events that occur after entry may be considered as circumstantial evidence of unauthorized entry. See *People v. Morrison*, 137 Ill. App. 3d 171, 179 (1985) (listing, among circumstantial evidence that the defendants did not have authority to enter the victims'

dwelling, that once inside, the defendants ordered the victims into a room at gunpoint and told them to remove their jewelry).

¶ 41     Here, the prosecutor accurately stated that one of the elements the State had to prove was that defendant, or one for whose conduct he was legally responsible for, entered Rogers's dwelling place without authority. The prosecutor pointed out Rogers's testimony as direct evidence proving that element, and then explained that there was circumstantial evidence of unauthorized entry as well. In the course of listing the circumstantial evidence, the prosecutor made the above-quoted remark. We cannot find that it was improper for the prosecutor to reference, as circumstantial evidence of unauthorized entry, events that took place after defendant and Brown entered Rogers's apartment. See *id.* Accordingly, defendant's argument fails.

¶ 42     The third set of comments to which defendant objects, which were made in rebuttal argument, are as follows:

> "Ladies and gentlemen, how dare this defendant get up here after beating savagely a 63-year-old woman and saying he was protecting her. How dare he get up here after doing what he did and tell lie after lie after lie. *How dare he after beating her the way that he did and take part in that say she got up on this witness stand and lied to you.*
>
> ***
>
> This has become a contest of credibility. But luckily, you, as the jury, have tools at your disposal to decide that contest of credibility and the first one is whose version of what took place was consistent.
>
> You saw [Rogers] testify as she was shaking and emotional up on that witness stand and how she slowly, consistently related to you what happened to her and what this

- 15 -

defendant and [Brown] did to her. And then you saw what she said happened to her just seconds after it took place.

When the police came running in, you saw that body cam and *it was the exact same story she told you from the witness stand*." (Emphasis added.)

¶ 43    Defendant contends that in making these remarks, especially the emphasized comments, the State improperly bolstered Rogers's credibility. He argues that "by berating [defendant] for saying that Rogers had lied, the prosecutor unambiguously communicated to the jury that she was—without any doubt in the State's mind—telling the truth." Defendant maintains that since Rogers's credibility was in question just as much as his own, the State's interference with the jurors' ability to freely evaluate her testimony was critical. He argues that the State, by proclaiming that he should not "dare" to tell his side of the story and allege Rogers was being untruthful, denigrated his right to testify, reprimanded him for presenting his own version of events, and improperly vouched for the credibility of its own witness. Further, he maintains that by referencing Rogers's "exact same story," the State urged the jury to embrace an improper inference, *i.e.*, that repetition creates credibility, and improperly buttressed Rogers's credibility.

¶ 44    The State counters that the prosecutor's remarks were made in direct response to defendant's closing arguments and were therefore proper. A prosecutor may respond to comments made by the defense that clearly invite a response. *People v. Armstrong*, 183 Ill. 2d 130, 146 (1998). Further, closing arguments must be viewed in their entirety, with specific comments viewed in context. *Id.* Having reviewed the entire transcript of closing arguments, we agree with the State.

¶ 45    The record shows that defendant made numerous remarks in his closing argument admitting that he had lied at various points of the investigation and asserting that Rogers had made false statements and lied. For example, defendant argued: (1) "[W]hy I made false statements to the interviewing officer was because I was trying to get back at Miss Rogers for making false statements that got me locked up"; (2) "After what I was accused of, what she stated on the stand in this courtroom that I so called did to her which had me locked up right today because [of] her false statements, I'm being here. I'm being locked up because of a woman's lying, false statements, ladies and gentlemen"; (3) "Like I said, that woman sat right up there and she stated that I hit her. I held her down. Under oath. This woman stated that she lied just like I lied. I made false statements. She made false statements. Her false statement got me locked up"; (4) "[W]hen I was at the police station I was giving false statements to that police officer which is normal. We, you know, you know, false statements to police officers. I mean that's nothing new. But it's nothing new that people give false statements in a courtroom all the time and she did it and this is a fact that she did it. This is a fact that she gave false statement"; and (5) "I have proven that Miss Rogers gave a false statement in this courtroom under oath. I have proven that, ladies and gentlemen. She is a liar. She lied, but I admit when I made false statements. I admitted to you all that I made false statements to an officer. I admit that to you all. I did not make false statements to you all. If I did, I corrected it."

¶ 46    Defendant's closing argument included several admissions that he had lied to the police and repeated accusations that Rogers had lied both prior to and at trial. From this context, it is clear that the State's remarks were designed to rebut defendant's recurring claim that Rogers's testimony was false and that she was a liar. Accordingly, we find no impropriety, as the State was free to

respond to defendant's argument. See, *e.g.*, *People v. Neal*, 2020 IL App (4th) 170869, ¶ 169 ("if one side calls the other a liar, it is perfectly within the bounds of proper argument to bluntly respond"); *People v. Sawczenko*, 180 Ill. App. 3d 406, 415 (1989) (rebuttal argument that referred to the defendant as a liar was not improper where defense counsel had raised the issue of the defendant's credibility and suggested that a State's witness had "played with the truth"); *People v. Branch*, 158 Ill. App. 3d 338, 342 (1987) (prosecutor's rebuttal vouching for the credibility of the victim and calling the defendant a liar was invited by defense argument suggesting the victim had been manipulated by her mother and the mother had a reason to lie).

¶ 47    We also reject defendant's contention that the State improperly buttressed Rogers's credibility in rebuttal by referring to the statements she made when the police arrived at her apartment. Defendant has cited no authority for the proposition that a prosecutor's reference to a witness's prior consistent statement could constitute reversible error. See *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 129. When presented with such a question, this court has found no error where the prosecutor did not describe the substance of any prior statements given by the State's witnesses, but rather, stated in passing that the witnesses had previously given statements (see *id.* ¶ 131), and where the prosecutor referenced witnesses' prior consistent statements but did not discuss their substance (see *People v. Sangster*, 2014 IL App (1st) 113457, ¶¶ 124-26). Here, the prosecutor stated, "When the police came running in, you saw that body cam and it was the exact same story she told you from the witness stand." This was a single comment made in passing that did not include a discussion of the substance of Rogers's prior statement. As such, we find no error.

¶ 48 The fourth set of comments to which defendant objects, also made in rebuttal, are as follows:

"As [Rogers] was being beaten inside her apartment, she was alone. As this defendant laid on top of her trying to shut her up by punching her and threatening her, [Rogers] was alone. As she tried to dress her wounds and stop this horrific event from happening, she was alone.

Here today in this courtroom, [Rogers] is no longer alone. She has the evidence. She has the facts. But most importantly, she has you. When you walked through those doors, you were no longer ordinary citizens. You became representatives of our community and when you speak, your verdict will represent justice."

¶ 49 Defendant contends that these comments bore no relevance to the question of guilt or innocence, but rather, merely served to inflame the jury's passions against him and in favor of Rogers. He argues that not only were the comments an improperly emotive plea, but, "even more egregious, it insinuated that the jurors were specifically there for Rogers—that they were to act as her advocate and not as impartial fact-finders." Defendant further asserts that it was improper for the State to tell the jury their duty to Rogers was more important than the actual evidence at trial.

¶ 50 In making this argument, defendant relies on *People v. Thomas*, 146 Ill. App. 3d 1087, 1089 (1986). In *Thomas*, the prosecutor told the jury that, because the victim had unexpectedly testified adversely to the State, the eyewitness was afraid of the defendant's family, and no one from the eyewitness's family was in court, "There's nobody here for the People, just you." *Id.* at 1089. This court considered the remark plain error, holding that it misstated the function of the

jury and "was a perversion of the principle that a jury is composed of nonpartisans who function under the presumption that a defendant is innocent until proved otherwise." *Id.*

¶ 51    Here, unlike in *Thomas*, the prosecutor did not encourage the jury to be "there" for the People, or otherwise present this case as one in which the jury was aligned with the State or united against defendant, which would be inconsistent with the jury's non-partisan role. Rather, the prosecutor immediately followed the comment, "she has you," with an exhortation to the jury to administer justice: "When you walked through those doors, you were no longer ordinary citizens. You became representatives of our community and when you speak, your verdict will represent justice." We agree with the State that the prosecutor's comments, viewed in context, urged the fearless administration of justice and the law. This is an "entirely proper" thing for a prosecutor to do. *People v. Harris*, 129 Ill. 2d 123, 159 (1989); see also *People v. Smith*, 199 Ill. App. 3d 839, 855 (1990) (finding prosecutor's argument that "she [the victim] depends on you for justice" was proper); *People v. Johnson*, 220 Ill. App. 3d 550, 562 (1991) (rejecting contention that the prosecutor improperly misstated the function of the jury and aligned the jury with the State and its witnesses by stating that "[the witnesses] had the courage to come in and testify for the same reason you are here and that is to see that justice is done"). Therefore, we find no clear error.

¶ 52    Finally, defendant contends that he was denied a fair and impartial trial due to the cumulative effect of the prosecution's repeated misconduct. We reject this argument, as we have found no individual errors. A new trial is not warranted where a defendant raises several contentions of error, none of which rise to the level of reversible error, because " '[t]he whole can be no greater than the sum of its parts.' " *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 57 (quoting

*People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984), *abrogated on other grounds by People v. Gacho*, 122 Ill. 2d 221 (1988)).

¶ 53    Having reviewed the entirety of the closing and rebuttal arguments, we find no clear or obvious error. The challenged remarks did not misstate the evidence, misstate the law, improperly bolster the credibility of the victim, improperly serve the sole purpose of inflaming the jurors' emotions, or undermine the jurors' impartiality. Rather, the State's arguments were reasonable comments on the evidence that was elicited at trial and the inferences therefrom, were invited by defendant, or were proper appeals to the jury to administer justice.

¶ 54    In sum, there was nothing improper about the State's closing and rebuttal arguments. Accordingly, where the State did not exceed the bounds of a proper closing argument, defendant was not denied a fair trial. Because we do not find any of the challenged comments constituted clear or obvious error, we need not engage in a plain error analysis. *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 36. Defendant's contention that the State engaged in a pervasive pattern of prosecutorial misconduct throughout its closing and rebuttal arguments remains forfeited.

¶ 55    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 56    Affirmed.